In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 14-1493

DUNNET BAY CONSTRUCTION COMPANY,
an Illinois Corporation,

*Plaintiff-Appellant*,

*v.*

ERICA J. BORGGREN, in her official capacity as
Acting Secretary for the Illinois
Department of Transportation, et al.,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:10-cv-03051-RM-SMJ — **Richard Mills**, *Judge*.

———————————

ARGUED DECEMBER 12, 2014 — DECIDED AUGUST 19, 2015

———————————

Before ROVNER, WILLIAMS, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Plaintiff-Appellant Dunnet Bay
Construction Company sued Defendants-Appellees Illinois
Department of Transportation (IDOT) and its then-Secretary
of Transportation Gary Hannig in his official capacity, alleg-
ing that IDOT's Disadvantaged Business Enterprise (DBE)

Program discriminates on the basis of race. The district court granted summary judgment to Defendants, concluding that Dunnet Bay lacked standing to raise an equal protection challenge based on race and that the DBE Program survived the constitutional and other challenges. Dunnet Bay appeals. For the reasons that follow, we affirm.

### I. BACKGROUND

Dunnet Bay is a corporation that engages in general highway construction. It is prequalified to bid and work on IDOT projects and competes for federally assisted highway construction contracts awarded by IDOT. Dunnet Bay is owned and controlled by two white males. Between 2007 and 2009, its average annual gross receipts were over $52 million.

IDOT is the agency of the State of Illinois responsible for administering, building, operating, and maintaining the state highway system. It also is responsible for administering federally funded highway construction contracts in accordance with federal and state law, including the regulations promulgated by the U.S. Department of Transportation (USDOT), *see* 49 C.F.R. Part 26. IDOT administers a small business initiative program, which reserves certain work on contracts for small business enterprises. Gary Hannig was the Secretary of IDOT from February 2009 through the end of June 2011.

In order to receive federal-aid funds for highway contracts, IDOT must have a "disadvantaged business enterprise" participation program that complies with federal regulations. The Transportation Equity Act for the 21st Century ("TEA–21"), Pub. L. No. 105–178, 112 Stat. 107 (1998), as

amended by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, 23 U.S.C. § 101 Note, Pub. L. No. 109–59, 119 Stat. 1144 (2005), and the governing regulations require state recipients of federal-aid funds for highway contracts like IDOT to submit to the United States Department of Transportation (USDOT) a written plan that demonstrates, *inter alia,* that they are not discriminating against minorities and women in the award of contracts. Section 1101(b) of the TEA–21 provides that "not less than 10 percent of the amounts made available for any program under … [TEA–21] shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." A DBE is defined as a for-profit small business concern that is at least 51% owned and controlled by one or more socially and economically disadvantaged individuals. 49 C.F.R. § 26.5. There is a rebuttable presumption that women and members of racial minority groups are socially and economically disadvantaged, *id.,* but an individual owner of any race or gender may qualify as "socially and economically disadvantaged." *See id.* Under the applicable regulation, "a firm is not an eligible DBE in any Federal fiscal year if the firm (including its affiliates) has had average annual gross receipts … over the firm's previous three fiscal years, in excess of $22.41 million." 49 C.F.R. § 26.65(b) (2009).

States must set an overall goal for DBE participation in federally assisted contracts. 49 C.F.R. § 26.45(a). That goal "must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on [federal]-assisted contracts" and "must reflect [the state's] determination of the level of DBE participation [one] would expect absent the

effects of discrimination." *Id.* § 26.45(b). A state is not permitted to use quotas for DBEs but may use set-aside contracts for DBEs in limited circumstances. *Id.* § 26.43. A state "must meet the maximum feasible portion of" its overall DBE participation goal through race-neutral means, using contract goals to meet any portion that is not projected to be met with race-neutral means. *Id.* § 26.51(a), (d). In setting specific contract goals, a state should consider such factors as "the type of work involved, the location of the work and the availability of DBEs for the work of the particular contract." *Id.* § 26.51(e)(2).

Under the regulations, a contract may be awarded to a bidder who demonstrates that it has obtained enough DBE participation to meet the DBE contract goal, or demonstrates that it made adequate good faith efforts to meet the goal even if it did not meet the goal, *id.* § 26.53(a), which means that it "took all necessary and reasonable steps to achieve a DBE goal … which, by their scope, intensity, and appropriateness to the objective, could reasonably be expected to obtain sufficient DBE participation, even if they were not fully successful." 49 C.F.R. Pt. 26, App. A, § I. If a bidder demonstrates that it made adequate good faith efforts, it must not be denied award of the contract on the ground that it failed to meet the goal. *Id.* § 25.53(a)(2). If the apparent successful bidder fails to either meet the DBE contract goal or demonstrate good faith efforts, the state "must, before awarding the contract, provide the [bidder] an opportunity for administrative reconsideration." *Id.* § 26.53(d). If the state determines that the apparent successful bidder failed to show good faith efforts, the state must send the bidder a written explanation of the basis for the finding. *Id.* § 26.53(d)(4).

IDOT administers the DBE program in Illinois. IDOT prepared and submitted to USDOT for approval a DBE program governing federally funded highway construction contracts. IDOT established a statewide aspirational goal for DBE participation of 22.77%. IDOT typically achieved somewhere between 10% and 14% DBE participation. For fiscal year 2009, IDOT attained 11.15% minority participation on all construction projects. For fiscal year 2010, IDOT projected that it would achieve 4.12% DBE participation through race-neutral means, leaving 18.65% DBE participation to be met by using contract goals. The Federal Highway Administration (FHWA) expressed concern about states not reaching their DBE goals and indicated to IDOT that it would like to see the DBE participation opportunities increased.

IDOT has five regions that are subdivided into a total of nine districts. Each district is headed by a district engineer who is responsible for the highways in his or her district. The district engineers report to the regional engineers who report to the Director of Highways/Chief Engineer. A district engineer and equal employment opportunity (EEO) officer review each construction contract to decide whether the contract presents DBE participation opportunities. At all relevant times, Christine Reed was IDOT's Director of Highways/Chief Engineer and was responsible for goal setting. Reed reviewed recommendations for contract goals and small business initiatives. Contracts had been withdrawn from bidding by Secretary Hannig's predecessor to review DBE goals. After the goals were reviewed, the contracts were re-advertised with higher DBE goals.

Under IDOT's DBE program, if a bidder fails to meet the DBE contract goal, then it may request a modification of the goal, and provide documentation of its good faith efforts to meet the goal. These requests for modification are also known as "waivers." Historically, IDOT has granted goal modification requests. In calendar year 2007, it granted 57 of 63 pre-award goal modification requests; the six other bidders ultimately met the contract goal with post-bid assistance from IDOT. In calendar year 2008, IDOT granted 50 of 55 pre-award goal modification requests; the other five bidders ultimately met the DBE goal. And in calendar year 2009, IDOT granted 32 of 58 goal modification requests; the other contractors ultimately met the goals. In calendar year 2010, IDOT received 35 goal modification requests; it granted 21 of them and denied the rest.

Secretary Hannig became IDOT's Secretary in February 2009. He named William Grunloh his Chief of Staff. From the beginning of his term, Secretary Hannig told Reed that he wanted IDOT to make a "very strong effort" in setting and attempting to achieve DBE goals. As with prior IDOT Secretaries, Secretary Hannig was concerned about increasing DBE participation in federal contracts. Indeed, his first directive to IDOT's entire staff was to increase participation for minority companies. In a March 2009 meeting with Reed, Secretary Hannig made it "very clear that waivers would not be a part of a common practice of his administration." As a result, Reed told the regional engineers that "the Secretary was not interested in entertaining waivers as part of his administration" and told a contracting organization that "request[s] for waivers would be closely scrutinized and would be very difficult to get." In an April meeting about DBE participation for a bridge project, Secretary Hannig was "very

adamant that waivers were not going to be an acceptable part of his administration unless [they were] absolutely positively appropriate."

IDOT's Director of the Office of Business and Workforce Diversity (OBWD) Larry Parrish, who recommended whether waiver requests were granted or denied and sought approval of his recommendation from Secretary Hannig, advised Carol Lyle, IDOT's Deputy Director of OBWD, that he was under pressure not to forward waiver requests.

From time to time, Reed had discussions about DBE goals with Kristi Lafleur, the Deputy Chief of Staff in the Governor's Office who was responsible for oversight of IDOT and Darryl Harris, the Governor's Director of Diversity Enhancement. In September 2009, Lafleur emailed Secretary Hannig that "[w]e need an action plan from [IDOT] on increasing the DBE numbers" and "we need an overhaul for the program and need to announce a new program." Secretary Hannig responded that "an overhaul of this program is in order" but "[t]he federal guidelines make the program goals and not set asides." Beginning with his appointment in November 2009 as Director of Diversity Enhancement, Harris made it clear to Secretary Hannig, Reed, and other IDOT personnel that DBE participation was a top priority and that goal modifications were not favored.

In early December 2009, IDOT sought bids for a highway resurfacing project for a portion of Interstate 290, known as the Eisenhower Expressway. There were four federally funded contracts for construction work on the Eisenhower, one of which was Contract No. 60I57, the contract at issue in this case. Henry Gray, a civil engineer and EEO Officer for District 1, set the DBE goals for the contracts. He set DBE

participation goals of 8% for three of the four contracts, including Contract No. 60I57; the goal for the fourth contract was set at 10%.

In mid-December Secretary Hannig ordered the withdrawal of the invitation for bids for the Eisenhower projects. Before doing so, he had been advised that the Governor's Office wanted a weighted average DBE participation goal of 20% for those projects. Secretary Hannig wrote Reed and Grunloh that "we need to get the [E]isenhower up to 20% minority participation" and back on schedule. [1] Secretary Hannig and Reed were comfortable that the goal could be met within the law. Reed advised Secretary Hannig that the contract goals were "relatively low" and there was opportunity to increase the goals under federal law. IDOT expanded the scope of the projects and items deemed eligible for DBE consideration—by expanding the geographic areas to determine DBE eligibility and by adding pavement patching, landscaping, and other work originally reserved for small business initiatives to the existing DBE goals. These efforts increased the weighted average of the projects to 20%. IDOT issued a revised invitation for bids for a January 2010 letting with a new DBE participation goal on Contract No. 60I57 of 22%.

Earlier in 2009, IDOT had sought approval from USDOT to use "split goals" on a Mississippi River Bridge Project. USDOT rules do not allow "split goals"—separate goals for minorities and women. On December 14, Harris sent the Governor's Chief of Staff and others an email indicating that

---

[1] There is no "minority participation" goal, and, as noted, DBE status is not limited to any particular minority group.

the Federation of Women Contractors was "willing[] to drop [its] opposition to split goals" on the project if IDOT implements a "no waiver policy" like that of the Capital Development Board. Harris testified that he never agreed to have IDOT implement a no-waiver policy, but rather agreed to "bring it up for consideration."

On December 23, Secretary Hannig held a mandatory meeting with Grunloh, Reed, Parrish, and IDOT's Chief Counsel Ellen Schanzle-Haskins, as well as with some regional engineers and district EEO officers—the persons responsible for setting contract goals in their respective districts. Secretary Hannig made it clear that the staff needed to be more aggressive in setting DBE goals, that is, they needed to increase the goals. He expressed his concern about waivers and goal modifications, explaining that he did not want to have to decide between goal attainment and waivers and modifications. IDOT's Regional Engineer for the Metra East area, Mary Lamie, testified that the Secretary repeated several times that there would be no DBE waivers. However, she also said that based on the context of the meeting, she was "left with the impression that Secretary Hannig wasn't saying no waivers under any circumstances will ever be issued" but that requests for "waivers were going to be reviewed" at a high level, and "we needed to make sure that the appropriate documentation was provided" in order for a waiver to be issued.

The FHWA approved the methodology IDOT used to establish its statewide overall DBE goal of 22.77%. The FHWA reviewed and approved the individual contract goals for work on the Eisenhower projects for IDOT's January 15, 2010, bid letting. It also approved the IDOT DBE program

amendment that required contractors to submit with their bids their DBE utilization plans and documentation of good faith efforts to meet DBE goals.

On January 6, 2010, IDOT held an informational meeting for general contractors and DBE firms regarding the January 15, 2010 bid letting. IDOT discussed changes in its DBE contracting procedures and requirements. The District 8 (Metra East) EEO Officer Lee Coleman stated that Secretary Hannig had told him that no waivers would be granted with respect to DBE contract goals for the letting. However, IDOT's Director of Highways Reed told Secretary Hannig that a no-waiver policy was not possible because it violated the law. Secretary Hannig told Harris that a no-waiver policy was not allowed under federal law. The Secretary also advised the Governor's Chief Operating Officer Jack Lavin that IDOT was doing its best to follow the law and did not appreciate Harris trying to interject himself into IDOT's business.

IDOT has a "Bidders' List," also known as the "For Bid List of Bidders" and "For Bid List," which identifies all approved, prequalified general contractors for each item on a letting. DBEs rely on the For Bid List so they know to which contractors to submit subcontracting quotes. DBEs typically will not submit subcontracting quotes to general contractors who are not on the For Bid List. On January 14, IDOT issued the final For Bid List, identifying the authorized bidders on each project in the January 15 letting. IDOT inadvertently left Dunnet Bay off the For Bid List.

On January 15, Dunnet Bay submitted to IDOT a bid of $10,548,873.98 for Contract No. 60I57, which was the lowest bid on the contract. Dunnet Bay's bid was 0.73% under the engineer's estimate but 16% over the program estimate, ex-

ceeding the latter estimate by about $1.3 million.[2] Dunnet Bay submitted its DBE utilization plan, noting that it had planned to meet the DBE goal of 22%, but identified only $871,582.55 of subcontracting or 8.26% of its bid for DBE participation.[3] Three other bids were submitted; each of them met the DBE goal. The regional engineer for District 1 advised Director Reed that Dunnet Bay's bid was within the awardable range.

Dunnet Bay requested a goal modification, also known as a waiver, based on its good faith efforts to obtain the DBE goal. In December 2009, Dunnet Bay had attended a symposium where it met some DBEs. Beginning on January 4, 2010, Dunnet Bay faxed DBE subcontractors invitations to submit quotes and followed-up about a week later with telephone calls. Dunnet Bay solicited 796 companies, 453 of which were DBEs. It had contacted DBE networking organizations such as the Black Contractors United, Chicago Minority Business Development Council, and Chicago Urban League, and ad-

---

[2] The engineer's estimate is calculated by the relevant district engineer; it is a detailed analysis of the average cost of each work item and the total expenses. The program estimate is set by IDOT and used to allocate available funds for the fiscal year. A bid is compared to the engineer's estimate to determine whether or not it is within the awardable range. The program estimate is used to determine whether there is money in IDOT's budget to pay for the project. Reed stated that bids are measured against both the engineer's estimate (to determine if the bid is reasonable) and against the program estimate (to ensure there is enough money in the budget).

[3] Prior to 2010, a successful low bidder was required to submit its DBE utilization plan within 7 days after the letting. Effective with the January 15, 2010 letting, contractors were required to submit their DBE utilization plans and documentation of good faith efforts with their bids.

vertised subcontracting opportunities on its website. In addition, Dunnet Bay's president attended a mandatory pre-bid meeting, which provided DBEs an opportunity to network with prime contractors interested in bidding on the Eisenhower project. Dunnet Bay's efforts were essentially the same that it had made in the past and had proven successful in meeting DBE goals. Dunnet Bay was not among those contractors who often sought goal modification requests. In fact, Dunnet Bay met the goal for 8 of the 9 bids in the January 15, 2010 letting. However, despite utilizing IDOT's supportive services in the past, Dunnet Bay did not contact supportive services in connection with the Eisenhower project. Its president offered the explanation that supportive services were not of "any help."

DBE subcontractors submitted to Dunnet Bay post-bid quotes that would have enabled it to meet the DBE participation goal. At least one of the subcontractors indicated that its quote would have been submitted earlier had it known that Dunnet Bay was bidding on the project, that is, had IDOT not left Dunnet Bay off the For Bid List.

An interview of Darryl Harris was published in the January 2010 issue of *Capital City Courier.* (Governor Quinn was facing a formidable challenger in the Democratic primary election to be held on February 2, 2010.) In the interview, Harris discussed the DBE program on the Eisenhower projects:

> I can tell you one of the greatest successes that we have so far is that we have a project in the Chicago area called the Eisenhower Highway Project, which is a $90 billion dollar project. Traditionally, goals in the past were set around

6 or 8 percent. This administration can go on record that our goal is 20 percent, with one stage of that project being 30 percent for minority-owned businesses. Already you can see that the Governor is committed to providing opportunities for minorities and women … .

The Governor remains steadfast on a no-waiver policy. This has been a practice in C.D.B. [Capital Development Board] for several years. So, now we're encouraging the Department of Transportation to also have a no waiver policy.

[O]ur no-waiver policy is just that. You have to meet it. When we put goals on a project, we strongly encourage that those goal[s] are being met.

The article was not well-received by IDOT. Secretary Hannig was upset that Harris would make such statements that were contrary to federal law. Hannig had advised Harris that a "no waiver" policy was not allowed under federal law and that IDOT would not implement a policy "that was clearly in violation of the federal laws." The article drew objection from the Illinois Road & Builders Association who wrote Governor Quinn, requesting "complete repudiation" of Harris's statements about a "no-waiver policy." Secretary Hannig and IDOT's Chief Counsel responded by indicating that IDOT does not violate federal law and regulations, and that IDOT has granted and does grant waivers where appropriate.

In an email dated January 20, 2010, from Secretary Hannig to Harris and copied to Lafleur in the Governor's Office,

Hannig advised of the results of the bidding on Contract No. 60I57:

> The fourth project has 4 bidders. The low bidder is over budget but close in dollar amounts but is the only bidder to miss the DBE goals. Under our rules since the lowest bidder is close to our pre-bid estimate, he would normally be given the award if he could show a good faith effort to meet the DBE goals and was granted a waiver by I.D.O.T. If I.D.O.T. rules he did not make a good faith effort I.D.O.T. could award the contract to the next lowest bidder or rebid the project.

Secretary Hannig testified that the email was mistaken because the low bidder would not normally be awarded the contract because the bid was over IDOT's estimate. He explained, "We would have to take a look at it, and there could be some circumstances where it would be accepted." IDOT Chief Counsel Schanzle-Haskins stated that "[IDOT] would not normally award a contract that was [$1.3 million] over the program estimate"; instead, it "normally would reject the bid."

IDOT held a series of meetings to decide whether to award the Eisenhower contracts. Three of the bids were "way over" the program estimates. It was discussed that Dunnet Bay as the low bidder was over the program estimate, but within the awardable range. Secretary Hannig expressed concern about the race, gender, and ethnicity of the DBEs on the Eisenhower projects. Harris expressed concern that there were not enough African American subcontractors on the DBE list. Reed made recommendations to Secretary

Hannig regarding whether to rebid contracts, and he followed her recommendations to rebid contracts for financial concerns. Reed recommended to Secretary Hannig that Contract No. 60I57 be rebid because the low bidder was 16% over the project estimate and was left off the For Bidders List.

In a letter dated January 22, 2010, IDOT advised Dunnet Bay that it had made a "preliminary determination" that Dunnet Bay had not made good faith efforts to meet the DBE goal. Dunnet Bay's good faith efforts were not considered at that time, however. Rather, where the bidder failed to meet the DBE goal despite documentation of good faith efforts, IDOT initially rejected the bid and all bids as non-responsive. According to Carol Lyle, IDOT had decided to preliminarily reject any bid that did not meet the DBE goal and allow the contractor to seek a reconsideration hearing. A reconsideration hearing was set for January 25 to allow Dunnet Bay to provide documentation of its good faith efforts.

Secretary Hannig appointed IDOT Chief of Staff Grunloh, a former Democratic State Representative, to serve as reconsideration officer. As noted, Grunloh had participated in the December 23 meeting where Secretary Hannig made it clear he wanted aggressive DBE goal setting and expressed concern about goal modification requests. Dunnet Bay's reconsideration hearing was Grunloh's first as a hearing officer. Before the hearing, Lyle briefed Grunloh on the issues relevant to the reconsideration hearing, provided him with a copy of the applicable federal regulations and standards, including the good faith effort standards in Appendix A to Part 26 of the Code of Federal Regulations, and advised him

of the resources that were available to assist contractors in meeting DBE goals.

Grunloh, Lyle, Dunnet Bay's owner and president Tod Faerber, and Dunnet Bay employee Sarah Rose attended the reconsideration hearing. Dunnet Bay presented evidence of its good faith efforts. However, Faerber admitted that they had not used IDOT's supportive services. Dunnet Bay argued that it would have met the contract's DBE goal but for IDOT's error in leaving it off the For Bid List, which impacted the DBEs' submission of timely subcontracting quotes to Dunnet Bay.

After the reconsideration hearing, Faerber met with Lyle and Grunloh. Lyle initially believed that Dunnet Bay had demonstrated sufficient good faith efforts. She testified, however, that a major reason for this belief was because Dunnet Bay had been left off the For Bid List. Lyle subsequently expressed the opinion that Dunnet Bay could have done more to demonstrate good faith efforts, namely, by contacting supportive services as well as IDOT's Bureau of Small Business Enterprises and the district EEO officer.

Faerber also met with Secretary Hannig to express serious concern about his ability to get a fair hearing given the Darryl Harris article, which "seemed to imply that waivers were not going to be granted." The Secretary responded that he understood, but he was under pressure from Harris not to grant waivers. Faerber candidly testified that Secretary Hannig did not indicate whether or not IDOT would grant waivers.

Grunloh decided that Dunnet Bay's reconsideration request should be denied, having concluded that it had not

demonstrated good faith efforts to obtain DBE participation. Although Grunloh prepared no contemporaneous writing of his reasoning, he summarized his reasons as follows: (1) Dunnet Bay did not utilize IDOT's supportive services, and (2) the second, third, and fourth next lowest bidders were able to meet the 22% goal.

Grunloh also recommended to Secretary Hannig that the contract be rebid instead of awarded to the second lowest bidder because the low bidder (Dunnet Bay) had not been included on the final For Bid List. Similarly, Chief Counsel Schanzle-Haskins advised Secretary Hannig that IDOT "screwed up" by leaving Dunnet Bay off the bidders list, and so, in fairness, IDOT should not award the contract to the second lowest bidder. Because the low bidder was 16% over the project estimate and was left off the Final For Bid List, Secretary Hannig decided not to award the contract to the second lowest bidder and re-let Contract No. 60I57.

On February 2, Secretary Hannig contacted Faerber by telephone and advised that IDOT was not going to grant Dunnet Bay a waiver for the project and its bid was going to be rejected because it did not meet the DBE goal. Hannig explained that IDOT "felt bad" because Dunnet Bay was left off the For Bid List, and IDOT was going to rebid the project rather than award it to the second lowest bidder. Secretary Hannig sent Dunnet Bay a letter dated February 2, 2010, stating that its bid was "considered non-responsive and is hereby rejected." Secretary Hannig testified that Dunnet Bay's bid was rejected because it did not meet the DBA goal, but it "could have been rejected because [it] was too high"; however, IDOT never reached the question of whether or not it should award the contract based on the amount. Secretary

Hannig explained that had Dunnet Bay met the DBE goal, the next question would have been whether the bid was appropriate, and Reed had recommended that IDOT rebid the contract.

Four separate Eisenhower Expressway projects were advertised for bids for the January 15, 2010 bid letting. IDOT granted one of four goal modifications requested from that bid letting. (Reconsideration Hearing Officer Grunloh granted modification of the DBE participation goal on March 4, 2010.) Only one of the four projects was awarded; the other three, including Contract No. 60I57, were unacceptable to IDOT and were rebundled and re-advertised for bids for a February 2010 special letting. The re-bids were "much more competitive." Although Dunnet Bay's bid was lower than its first bid, it was not the lowest bid; it was the third out of five bidders.

On February 26, 2010, Dunnet Bay sued IDOT and Secretary Hannig in his official capacity, asserting race discrimination and equal protection claims under 42 U.S.C. §§ 1981 and 1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS 23/1–5. Dunnet Bay sought damages as well as a declaratory judgment that the DBE Program is unconstitutional and injunctive relief against its enforcement. Dunnet Bay sought summary judgment as to liability, contending that the Defendants exceeded the authority granted to them in the federal rules regarding DBE programs, so that the DBE Program was not insulated from constitutional attack and could not withstand strict scrutiny. Defendants also sought summary judgment, arguing that the DBE program was not subject to attack, that Dunnet Bay was not subjected

to intentional race discrimination, and that Dunnet Bay lacked standing to raise an equal protection challenge based upon race.

In a comprehensive and well-written opinion, the district court granted the Defendants' motion and denied Dunnet Bay's motion. The court concluded "that Dunnet Bay lacks Article III standing to raise an equal protection challenge because it has not suffered a 'particularized' injury that was caused by IDOT. Dunnet Bay was not deprived of the ability to compete on an equal basis." *Dunnet Bay Constr. Co. v. Hannig*, 3:10-cv-3051, 2014 WL 552213, at *30 (C.D. Ill. Feb. 12, 2014). The court also determined that Dunnet Bay, which does not qualify as a small business, lacks prudential "standing to vindicate the rights of a (hypothetical) white-owned small business." *Id.*

Even if Dunnet Bay had standing to bring an equal protection claim, the court concluded that the Defendants were entitled to summary judgment. *Id.* It stated that to establish an equal protection violation, IDOT would have to show that it was treated less favorably than another similarly situated entity. The court found that only speculation could resolve whether Dunnet Bay or any other contractor would have been awarded the Contract but for IDOT's DBE Program. It reasoned that no one could know what the second lowest bidder's bid would have been if it had not met the 22% goal or what Dunnet Bay's bid would have been had it met the 22% goal, or whether Dunnet Bay would have been awarded the contract had it demonstrated adequate good faith efforts because its bid was over the program estimate. And because Dunnet Bay was held to the same standards as every other bidder, the court concluded that Dunnet Bay

could not establish that it was the victim of racial discrimination. *Id.* at *31.

Moreover, the court determined that IDOT had not exceeded its federal authority under the federal rules and that Dunnet Bay's challenge to the DBE program fails under *Northern Contracting, Inc. v. Illinois*, 473 F.3d 715, 721 (7th Cir. 2007), which insulates a state DBE program from a constitutional attack absent a showing that the state exceeded its federal authority. *Id.* at *26-*29. The court determined that there was no reasonable basis to find that IDOT exceeded its federal authority by (1) setting the 22% DBE goal on the Eisenhower Contract; (2) imposing a "no waiver" policy by refusing to grant waivers of DBE goals, given that a waiver was granted in connection with the January 15, 2010 letting at issue and waivers were granted before and after that letting; (3) denying Dunnet Bay's waiver request initially and on reconsideration upon finding that it did not make adequate good faith efforts; and (4) omitting from its denial letter the reasons why its good faith efforts were inadequate, given that the "technical" violation did not prejudice Dunnet Bay. Furthermore, because IDOT rebid the project, the court concluded that a reconsideration hearing was not required, and because the contract was not awarded to the next lowest bidder, it decided the claim was moot. *Id.* at *29. Dunnet Bay appeals from the district court's judgment.

## II. DISCUSSION

Dunnet Bay contends that it was denied a state highway construction contract because of race discrimination in

IDOT's DBE Program. We review the district court's ruling on the cross-motions for summary judgment *de novo*, construing all reasonable inferences from the record in favor of the party against whom the motion under consideration is made. *Tompkins v. Cent. Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013).

### A. Dunnet Bay's Standing to Raise an Equal Protection Claim

The first issue we address is whether Dunnet Bay has standing to challenge IDOT's DBE Program on the ground that it discriminates on the basis of race in the award of highway construction contracts. In other words, is Dunnet Bay a proper plaintiff to challenge the DBE program on the basis of alleged race discrimination? If Dunnet Bay lacks standing, then we lack jurisdiction to consider the merits of the equal protection claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

Standing arises under Article III's "case or controversy" requirement. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing has three elements: (1) an "injury in fact," that is, "an invasion of a legally protected interest which is … concrete and particularized, and … actual or imminent"; (2) a causal connection between the injury and the challenged conduct, meaning that the injury is "fairly traceable" to the challenged conduct; and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citations and internal quotation marks omitted). These are the constitutional minimum requirements for standing. *See id.* at 560.

There are also prudential limitations on standing. *Lujan*, 504 U.S. at 560; *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975). One of these limitations is that "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth*, 422 U.S. at 499. Another prudential limitation is that a litigant "generally must assert his own legal rights and interests" and cannot assert "the legal rights or interests of third parties." *Id.* In contrast with constitutional limitations on standing, prudential limitations are not jurisdictional and may be disregarded in certain situations. *Id.* at 500–01 (recognizing that as long as constitutional standing is satisfied, a party "may have standing to seek relief on the basis of the legal rights and interests of others"). In addition, a litigant may forfeit prudential standing arguments by failing to present them in the district court. *See Bd. of Educ. of Oak Park & River Forest High Sch. Dist. No. 200 v. Kelly E.*, 207 F.3d 931, 934 (7th Cir. 2000) (stating that "prudential considerations … are forfeited if not presented in a timely fashion").

"The party invoking federal jurisdiction bears the burden of establishing [the standing] elements[,] … [and] each element must be supported … with the manner and degree of evidence required at the successive stages of the litigation." *Edgewood Manor Apart. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013) (quoting *Lujan*, 504 U.S. at 561 (citations omitted)). "At the summary-judgment stage, 'the plaintiff can no longer rest on … mere allegations, but must set forth by affidavit or other evidence specific facts.'" *Id.* (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and citations omitted)). Thus, because the district court decided that Dunnet Bay lacked standing at the summary judgment

stage, mere allegations of standing are not enough; Dunnet Bay must present evidence to establish the elements of standing.

Dunnet Bay contends that it has standing because it has suffered an injury in fact. First, it asserts that IDOT's race-conscious DBE program prevented it from competing on equal footing with DBE contractors and prevented it from being awarded the contract. Dunnet Bay also claims that it was injured because the DBE program forced it to participate in a discriminatory scheme.

The Supreme Court addressed standing to raise an equal protection challenge to race-conscious government contracting programs in *Northeastern Fla. Chapter, Associated General Contractors of America v. Jacksonville*, 508 U.S. 656 (1993), and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). In *Northeastern Florida*, an association of contractors challenged a Jacksonville, Florida ordinance setting aside 10% of city contracts for businesses that were minority- or women-owned. Once a project was earmarked for minority business enterprise bidding, it was "deemed reserved for minority business enterprises only" and non-minority business enterprises could not even bid on the project. 508 U.S. at 658. The Court concluded:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection

> case of this variety is the denial of equal treat-
> ment resulting from the imposition of the bar-
> rier, not the ultimate inability to obtain the
> benefit.

*Id.* at 666. The Court held that "in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* Therefore, to establish standing to challenge a set-aside program, a plaintiff "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.*; *see Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (holding that Caucasian applicant for university admission had standing to seek prospective relief challenging university's use of race in its admissions policy where he was denied admission but a minority applicant with his qualifications would have been admitted and applicant was "able and ready" to apply as a transfer student if the university stopped using race in its admissions policy).

In *Adarand,* the Court addressed whether a subcontractor had standing to raise an equal protection challenge to a law that gave general contractors a direct financial incentive to hire subcontractors controlled by "socially and economically disadvantaged individuals." 515 U.S. at 204. The plaintiff submitted the low bid but was not awarded the subcontract and submitted evidence that the general contractor would have accepted its bid, but for the subcontractor compensation clause that provided it additional payment for hiring the disadvantaged subcontractor. *Id.* at 205. The plaintiff also established that it often competed for contracts against companies certified as small disadvantaged businesses. *Id.* at 212.

The Court held that the plaintiff had standing to seek forward-looking relief because the "discriminatory classification prevent[s] the plaintiff from competing on equal footing." *Id.* at 211 (citing *Northeastern Fla.,* 508 U.S. at 667). In other words, because the subcontractor compensation clause made the plaintiff more expensive to hire, it could not compete on equal footing with subcontractors considered disadvantaged because of their race. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280–81 n.14 (1978) (holding white medical school applicant had standing to challenge school's admissions program which reserved a prescribed number of positions in the class for disadvantaged minorities because the "injury" was the school's "decision not to permit [him] to compete for all 100 places in the class, simply because of his race"); *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 920–21 (7th Cir. 2002) (stating that "[a] statute that deprives a firm of an opportunity to *compete* for business gives standing to sue").

In arguing that it was unable to compete on equal footing with DBE contractors, Dunnet Bay asserts that it "need only show that it was excluded from competition and consideration for a government benefit because of race-based measures." Yet Dunnet Bay has not established that it was excluded from competition or otherwise disadvantaged because of race-based measures. First, in contrast with *Northeastern Florida*, nothing in IDOT's DBE program excluded Dunnet Bay from competition for any contract. IDOT's DBE program is not a "set aside program like Jacksonville's" in which non-minority owned businesses could not even bid on certain contracts. Under IDOT's DBE program, all contractors—minority and non-minority contractors alike—can bid on all contracts, subject to the DBE goals or good faith efforts to satisfy those goals.

Further, Jacksonville's ordinance favored "minority business enterprises," defined as a business with minority or female ownership. IDOT's DBE program is designed to increase the participation of socially and economically disadvantaged businesses in construction contracts, *see N. Contracting*, 473 F.3d at 720–24 (holding IDOT's DBE program constitutional), and therefore addresses a broader category of disadvantaged businesses than that addressed in Jacksonville's ordinance. The absence of complete exclusion from competition for certain projects with minority- or women-owned businesses also distinguishes some of the other authorities cited by Dunnet Bay and amici: *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 905–06 (11th Cir. 1997) (holding trade associations whose members regularly performed work for county had standing to challenge county's affirmative action program that allowed contracts to be set aside for bidding only among minority and women business enterprise programs); *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 929–30 (9th Cir. 1991) (holding contractor had standing to challenge county's minority- and women-owned business enterprise program where a set-aside method applied under which a contractor had to use minority- or women-owned businesses for a certain percentage of work on the contract).

And unlike in *Adarand*, where the challenged law explicitly favored minority-owned subcontractors by providing a direct financial incentive to contractors to hire them, Dunnet Bay has not alleged, let alone produced evidence to show, that it was treated less favorably than any other contractor because of the race of its owners. The lack of an explicit preference for minority-owned businesses distinguishes other authorities cited by Dunnet Bay. *See Bras v. Cal. Pub. Utils.*

*Comm'n*, 59 F.3d 869, 871 (9th Cir. 1995) (public utility pro-
vided a pre-qualification preference to minority- and wom-
en-owned businesses and plaintiff lost opportunity to nego-
tiate with utility because race and gender were considered);
*Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ.
Equity*, 950 F.2d 1401, 1404 (9th Cir. 1991) (ordinance gave
5% bid preference to minority- and women-owned business-
es for public contracts); *see also Coral Constr.*, 941 F.2d at 914,
930 (holding contractor had standing to challenge program
that gave minority- and women-owned businesses a prefer-
ence for public contracts if their bid was within 5% of the
lowest bid). Under IDOT's DBE program, all contractors are
treated alike and subject to the same rules.

Still other authorities cited by Dunnet Bay or amici are
inapposite because the contractors' standing was based in
part on the fact that they lost an award of a contract for fail-
ing to meet the disadvantage business enterprise goal or fail-
ing to show good faith efforts, despite being the low bidders
on the contract, and the second lowest bidder was awarded
the contract. *See Safeco Ins. Co. of Am. v. City of White House,
Tenn.*, 191 F.3d 675, 689 (6th Cir. 1999) (holding contractor
and its insurer had standing to challenge the constitutionali-
ty of EPA regulations imposing a racial preference on minor-
ity subcontracts where the alleged failure to comply with the
regulations resulted in the loss of a contract which was
awarded to the second lowest bidder and the regulations
placed white subcontractors at a competitive disadvantage);
*Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 704 (9th Cir. 1997)
(noting that plaintiff submitted the lowest bid but did not
get the contract since its "bid was disqualified because [it]
did not comply with a state statute" and the second lowest
bidder won the contract); *Concrete Works of Colo., Inc. v. City*

*& Cnty. of Denver*, 36 F.3d 1513, 1518 & n.5 (10th Cir. 1994) (holding contractor demonstrated injury in fact where it "submitted bids on three projects and the [o]rdinance prevented it from competing on an equal basis with minority and women-owned prime contractors" and noting that the plaintiff submitted the lowest bid on one project but its bid was not accepted because of its failure to meet the minority-businesses enterprise goals or good faith requirements and the bid was awarded to the second lowest bidder); *Contractors Ass'n of E. Pa., Inc. v. City of Phila.*, 6 F.3d 990, 994–96 (3d Cir. 1993) (concluding that associations of contractors had standing to challenge city ordinance creating contract preferences for businesses owned by minorities, women, and disabled persons where association members presented evidence they were denied contracts for failure to meet the DBE goals despite being low bidders); *but see W.H. Scott Constr. Co. v. City of Jackson, Miss.*, 199 F.3d 206, 214–15 (5th Cir. 1999) (holding that non-minority contractor had standing to bring an equal protection challenge to city's minority participation program because non-minority contractors were at a competitive disadvantage with minority contractors who could satisfy the minority-participation goals with their own work, but relying on *Monterey Mechanical* and *Concrete Works*).

In contrast with these cases where the plaintiffs had standing, Dunnet Bay cannot establish that it would have been awarded the contract on the Eisenhower project but for its failure to meet the DBE goal or demonstrate good faith efforts. The evidence, even when viewed in the light most favorable to Dunnet Bay, demonstrates that although Dunnet Bay's bid was rejected for failing to meet the DBE goal, its bid was 16% or about $1.3 million over the program esti-

mate, and Director Reed recommended that IDOT rebid the contract because the low bid was 16% over the project estimate and Dunnet Bay had been left off the For Bidders List. The evidence further establishes that Secretary Hannig always followed Reed's recommendations to rebid contracts for financial concerns. Indeed, the Secretary decided to rebid the contract because the low bidder was 16% over the project estimate and was left off the final For Bid List.

Moreover, even assuming that Dunnet Bay could establish that it was excluded from competition with DBEs or that it was disadvantaged as compared to DBEs, it cannot show that any difference in treatment was because of race. The regulations define a DBE as "a for-profit small business concern" that is owned or controlled "by one or more individuals who are both socially and economically disadvantaged." 49 C.F.R. § 26.5 (2009). "Socially and economically disadvantaged" individuals include women, "Black Americans," "Hispanic Americans," and others. *Id.* And an individual in any racial group or gender may qualify as "socially and economically disadvantaged." *See id.* However, "a firm is not an eligible DBE in any Federal fiscal year if the firm (including its affiliates) has had average annual gross receipts … over the firm's previous three fiscal years, in excess of $22.41 million." 49 C.F.R. § 26.65(b) (2009). For the three years preceding 2010, the year it bid on the Eisenhower project, Dunnet Bay's average gross receipts were over $52 million. Therefore, Dunnet Bay's size makes it ineligible to qualify as a DBE, regardless of the race of its owners. Thus, even if a DBE general contractor can count its own work force toward meeting the DBE participation goal without subcontracting any work on the project, whereas a non-DBE general contractor cannot, Dunnet Bay has not shown that any addition-

al costs or burdens that it would incur are *because of race*. The additional costs and burdens are equally attributable to Dunnet Bay's size.

To put it differently, Dunnet Bay has not established that the denial of equal treatment resulted from the imposition of a racial barrier. Accordingly, this case is unlike those relied on by Dunnet Bay where the plaintiff established that the difference in treatment and any additional costs and burdens imposed on it were because of race (or gender). For example, in *Monterey Mechanical*, the challenged ordinance provided that "contracts awarded by … [the state] for construction … shall have statewide participation goals of not less than 15 percent for minority business enterprises [and] not less than 5 percent for women business enterprises" 125 F.3d at 704 (citing Cal. Pub. Contract Code § 10115(c)). The court concluded that the contractor was at a competitive disadvantage with minority- and women-owned contractors who could use their own work toward the participation goals and be excused from subcontracting the good faith requirements. *Id.* at 706–07. Race (or gender) alone was the barrier to equal competition. *Id.*

As for its second alleged injury, Dunnet Bay argues that it was forced to participate in a discriminatory scheme and was required to consider race in subcontracting. In *Monterey Mechanical*, the court held that "[a] person required by the government to discriminate by ethnicity or sex against others has standing to challenge the validity of the requirement, even though the government does not discriminate against him." *Id.* at 707. This holding was followed in *Safeco Insurance Co.*, 191 F.3d at 689, and *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 350 (D.C. Cir.) (noting that "forced dis-

crimination may itself be an injury"), *reh'g denied*, 154 F.3d 344 (D.C. Cir. 1998), but the latter court couched the issue in terms of third-party standing. It seems that *Monterey Mechanical* collapsed third-party standing into Article III standing. And in each of these cases—*Monterey Mechanical*, *Safeco Insurance Co.*, and *Lutheran Church-Missouri Synod*—the plaintiffs already had established injury in fact, that is, suffered another direct harm because of the challenged statute or regulation. *See Safeco Ins. Co.*, 191 F.3d at 689 (failure to comply with regulations resulted in the loss of a contract and institution of the lawsuit); *Lutheran Church-Mo. Synod*, 141 F.3d at 348–49 (FCC order found that church violated EEO regulations and imposed a fine and reporting requirements); *Monterey Mech.*, 125 F.3d at 704 (plaintiff submitted the low bid but did not get the job because of its failure to comply with a state statute). As discussed above, where the plaintiff has established injury in fact, it may assert third-party rights.

Neither we nor the Supreme Court has adopted *Monterey Mechanical*'s broad view of standing. We recognize that the Court has held that "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (citing *Adarand* and *Northeastern Fla.*). However, the injuries asserted in *Parents Involved* were the denial of assignment to a certain public high school based on race and the interest "in not being forced to compete for seats at certain high schools in a system that uses race as a deciding factor in many of its admissions decisions." *Id.* The plaintiffs' children were competing with minorities for assignment to high school, and race was used as a tiebreaker to make assign-

ments to more popular schools. *Parents Involved*, 551 U.S. at 711–12. In other words, race often was the determinative factor in the assignment decisions. Similarly, non-minority contractors were precluded from competing at all for certain projects under the Jacksonville ordinance in *Northeastern Florida*, and in *Adarand*, the government gave general contractors a financial incentive to hire minority-owned businesses. Thus, as in *Parents Involved*, the race of the plaintiffs in *Northeastern Florida* and *Adarand* was the deciding factor. In contrast, the race of Dunnet Bay's owners was not the deciding factor because Dunnet Bay's size created a barrier to its receipt of any advantages given DBEs.

Furthermore, we agree with amicus NAACP Legal Defense & Educational Fund, Inc. that *Monterey Mechanical*'s broad view of standing goes against the established principle that "a plaintiff raising only a generally available grievance about government—claiming only harm to every citizen's interest in proper application of the Constitution and laws" does not satisfy Article III's requirement that the injury be concrete and particularized. *See Lujan*, 504 U.S. at 573–74; *see also Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree."); *Allen v. Wright*, 468 U.S. 737, 755 (1984) (stating that racial discrimination "is sufficient in some circumstances to support standing" but only those "who are personally denied equal treatment by the challenged discriminatory conduct" have Article III standing) (quotation omitted). Broadly speaking, not every contractor has "standing to challenge every affirmative-action program on the basis of a personal right to a government that does not deny equal protection of the laws." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464,

489 n.26 (1982). Dunnet Bay's claimed injury of being forced
to participate in a discriminatory scheme amounts to "a chal-
lenge to the state's application of a federally mandated pro-
gram," which we have determined "must be limited to the
question of whether the state exceeded its authority." *N.
Contracting,* 473 F.3d at 720–21 (holding that IDOT may rely
on federal government's compelling interest in remedying
past discrimination in construction projects and that IDOT's
DBE program is narrowly tailored to achieve this interest as
IDOT did not exceed its authority). Dunnet Bay was not de-
nied equal treatment because of racial discrimination; any
difference in treatment is equally attributable to Dunnet
Bay's *size*.

Although Dunnet Bay suggests that the second and third
standing elements (causation and redressability) are not at
issue, as the party invoking federal court jurisdiction, it
bears the burden of establishing all three elements of stand-
ing. *See Edgewood Manor Apart. Homes*, 733 F.3d at 771. Ami-
cus Pacific Legal Foundation suggests that since Dunnet Bay
suffered an injury in fact under the DBE program, which we
reiterate Dunnet Bay has not established, it necessarily estab-
lished causation and redressability. Amicus cites *Northeast-
ern Florida*, where causation and redressability followed
from the Court's definition of "injury in fact." 508 U.S. at 666
n.5. Although that was true in the context of the set-aside
program where causation and redressability were readily
apparent, the Court did not hold that these other elements
are always collapsed into an injury in fact.

Dunnet Bay has not established causation or redressabil-
ity. It failed to demonstrate that the DBE program caused it
any injury during the first letting process. Although Dunnet

Bay submitted the low bid in the first letting, its bid was 16% over the project estimate. Although IDOT rejected its bid because it did not meet the DBE goal, IDOT never reached the question of whether the bid was appropriate. The evidence establishes that Reed recommended to Secretary Hannig that IDOT rebid Contract No. 60I57 because the low bidder was 16% over the project estimate and was left off the For Bidders List, and that the Secretary always followed her recommendations to rebid contracts for financial concerns. Accordingly, IDOT did not award the contract to anyone under the first letting and re-let the contract. Dunnet Bay suffered no injury because of the DBE program in the first letting. *Cf. Texas v. Lesage*, 528 U.S. 18, 21 (1999) ("[W]here a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have made the same decision regardless, there is no cognizable injury.").

Even assuming that Dunnet Bay could establish that the DBE program caused it an injury in the first letting, it cannot establish redressability: IDOT's decision to re-let the contract redressed any injury. As for the second letting, the evidence does not establish that the DBE program caused Dunnet Bay any injury. In the second letting, Dunnet Bay satisfied the DBE goals, but its bid was not the lowest; other contractors submitted lower bids and met the DBE participation goals. Therefore, Dunnet Bay was not awarded the contract.

Moreover, prudential limitations preclude Dunnet Bay from bringing its claim. A litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*,

422 U.S. at 499.[4] Dunnet Bay acknowledges that before a litigant may be permitted to assert another's rights to establish a claim, he must satisfy Article III standing requirements. *See Craig v. Boren*, 429 U.S. 190, 194 (1976) ("[W]e conclude that appellant … has established independently her claim to assert jus tertii standing. The operation of [the challenged statutes] plainly has inflicted 'injury in fact' upon appellant sufficient … to satisfy the constitutionally based standing requirements imposed by Art. III."); *Barrows v. Jackson*, 346 U.S. 249, 255–56 (1953) (stating that "a person cannot challenge the constitutionality of a statute unless he shows that he himself is injured by its operation" but "this principle has no application to the instant case in which respondent has been sued for damages … and … a judgment against respondent would constitute a direct … injury to her"); *Lutheran Church-Mo. Synod*, 141 F.3d at 349–50 (allowing the plaintiff to raise an equal protection challenge although it had not suffered an equal protection injury where it was harmed by the FCC's order finding it in violation of equal employment opportunity regulations); *Apter v. Richardson*, 510 F.2d 351, 354 (7th Cir. 1975) (stating "[t]he fact that the alleged wrong may also have injured third parties does not deprive plaintiff of standing so long as she as well is injured in fact."); *see also Warth*, 422 U.S. at 501 (stating that as long as constitutional standing is satisfied, a party "may have standing to seek relief on the basis of the legal rights and interests of others"). In challenging the DBE program, Dunnet Bay is attempting

---

[4] Although IDOT has a good argument that Dunnet Bay forfeited its prudential standing arguments for failing to raise them in the district court in response to its summary judgment motion, we address prudential limitations on standing.

to assert the equal protection rights of a non-minority-owned small business.

*City of Chicago v. Morales*, 527 U.S. 41 (1999), also cited by Dunnet Bay, is inapposite. In that case, the Supreme Court was asked to review the Illinois Supreme Court's determination that a Chicago gang ordinance was unconstitutionally vague. As the Court explained, "[w]hen a state court has reached the merits of a constitutional claim, invoking prudential limitations on the respondent's assertion of *jus tertii* would serve no functional purpose" and "state courts need not apply prudential notions of standing created by this Court." *Id.* at 55 n.22. Dunnet Bay does not ask us to review a state court's decision as to the constitutionality of the DBE program.

A party is exempt from the prudential limitation on asserting a third party's rights, Dunnet Bay argues, "where the limitation's purpose is outweighed by the need to protect fundamental rights." But *Barrows*, which was cited for this proposition, does not help Dunnet Bay. *Barrows* was a state court action to enforce a racially restrictive covenant, and the defendant was permitted to assert the equal protection rights of others in her defense against enforcement. Dunnet Bay is not defending against a state enforcement proceeding, seeking to raise the rights of others in its own defense. And as noted, the *Barrows* defendant had been sued for damages and thus could establish her own injury. Moreover, the Court concluded that the prudential limitation on standing was outweighed and the defendant should be allowed to assert the rights of others given the "unique situation" and "peculiar circumstances" presented where "the action of the state court … might result in a denial of constitutional rights

and … it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court." *Barrows*, 346 U.S. at 257.

But here there is no allegation, let alone evidence, that a non-minority-owned small business could not challenge IDOT's DBE program on equal protection grounds. Because Dunnet Bay has failed to identify an injury in fact that is fairly traceable to the challenged DBE program, it lacks Article III standing. And because Dunnet Bay has not established Article III standing, it cannot raise an equal protection challenge to the DBE program based on the rights of a non-minority small business.

## B. Whether Dunnet Bay Has Sufficient Evidence that IDOT's Implementation of the DBE Program Constitutes Unlawful Race Discrimination

In the alternative, even if Dunnet Bay has standing to raise an equal protection claim, IDOT is entitled to summary judgment. The Equal Protection Clause of the Fourteenth Amendment prohibits intentional and arbitrary discrimination. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Thus, to establish an equal protection claim under the Fourteenth Amendment, Dunnet Bay must show that IDOT "acted with discriminatory intent." *Franklin v. City of Evanston*, 384 F.3d 838, 846 (7th Cir. 2004).

Racial discrimination by a recipient of federal funds that violates the Equal Protection Clause also violates Title VI and § 1981. *Gratz*, 539 U.S. at 275–76 & n.23. These statutes require proof that the plaintiff was treated differently because of race. 42 U.S.C. § 1981 (providing all persons the same rights to contract and benefit of laws "as is enjoyed by

white citizens"); *id.* § 2000d (prohibiting discrimination "on the ground of race" in programs receiving federal assistance). Title VI prohibits only intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001). To establish liability for an equal protection violation, a plaintiff must establish that the defendant acted with a discriminatory purpose and discriminated against him because of his membership in an identifiable group. *Nabozny v. Podlesny*, 92 F.3d 446, 453 (7th Cir. 2002). Section 5 of the Illinois Civil Rights Act of 2003 was not intended to create new rights but merely created a new venue—state court—for discrimination claims under federal law. *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 856 N.E.2d 460, 467 (Ill. App. Ct. 2006).

Because IDOT's DBE program employs racial classifications, we apply strict scrutiny in addressing Dunnet Bay's constitutional challenge. *Adarand Constructors*, 515 U.S. at 235 ("Federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest."); *N. Contracting*, 473 F.3d at 720. Under strict scrutiny, "a government program that uses racial classifications must be narrowly tailored to serve a compelling governmental interest." *N. Contracting*, 473 F.3d at 720. In implementing its DBE program, IDOT may properly rely on "the federal government's compelling interest in remedying the effects of past discrimination in the national construction market." *Id.* at 720. "[A] state is insulated from [a constitutional challenge as to whether its program is narrowly tailored to achieve this compelling interest], absent a showing that the state exceeded its federal authority." *Id.* at 721; *see also Milwaukee Cnty. Pavers Ass'n v. Fielder*, 922 F.2d 419, 423 (7th Cir. 1991) ("Insofar as the state is merely complying with federal law it is acting as the agent

of the federal government and is no more subject to being enjoined on equal protection grounds than the federal civil servants who drafted the regulations … . If the state does exactly what the statute expects it to do … we do not see how the state can be thought to have violated the Constitution."). Thus, the issue is whether IDOT exceeded its authority under federal law.

Dunnet Bay contends that IDOT exceeded its federal authority by effectively creating racial quotas by designing the Eisenhower project to meet a pre-determined DBE goal and eliminating waivers. If the DBE program were effectively a quota, it would be unconstitutional and violate the regulations. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989) ("[T]he 30% quota cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing."); 49 C.F.R. § 26.43(a) (prohibiting quotas for DBEs). More specifically, Dunnet Bay asserts that IDOT exceeded its authority by: (1) setting the Contract's DBE participation goal at 22% without the required analysis, (2) implementing a "no-waiver" policy, (3) preliminarily denying its goal modification request without assessing its good faith efforts, (4) denying it a meaningful reconsideration hearing, (5) determining that its good faith efforts were inadequate, and (6) providing no written or other explanation of the basis for its good-faith-efforts determination.

In challenging the DBE contract goal, Dunnet Bay asserts that the issue "is not whether a 20% goal could have been legitimately derived" but instead argues that the DBE contract goal was "arbitrary" and that IDOT "manipulated the process to justify" a preordained goal. Dunnet Bay's real complaint about the contract goal setting is that there were

political motivations in resetting the DBE participation goal. But Dunnet Bay has not identified any regulation or other authority that suggests that the political motivations matter, provided IDOT did not exceed its federal authority in setting the contract goal. More to the point, Dunnet Bay does not actually challenge how IDOT went about setting its DBE goal for the contract. In its reply, Dunnet Bay argues that the factors set forth in the regulation to be used to determine contract goals were not used but were applied to justify a pre-ordained goal. Yet Dunnet Bay points to no evidence to show that IDOT failed to comply with the applicable regulation providing only general guidance on contract goal setting, 49 C.F.R. § 26.51(e)(2) (stating that a contract goal "depend[s] on such factors as the type of work involved, the location of the work, and the availability of DBEs for the work of the particular contract").

FHWA approved IDOT's methodology to establish its statewide DBE goal of 22.77% and approved the individual contract goals for the Eisenhower project for the January 15, 2010 bid letting. Dunnet Bay has not identified any part of the regulations that IDOT allegedly violated by re-evaluating and then increasing its DBE contract goal, by expanding the geographic area used to determine DBE availability, by adding pavement patching and landscaping work into the contract goal, by including items that had been set aside for small business enterprises, or by any other means by which it increased the DBE contract goal. Indeed, as the district court concluded, "because the federal regulations do not specify a procedure for arriving at contract goals, it is not apparent how IDOT could have exceeded its federal authority," *Dunnet Bay Constr. Co.*, 2014 WL 552213, at *26; and this challenge is unavailing.

Next, Dunnet Bay asserts that IDOT had a "no-waiver" policy. Despite statements regarding a no-waiver policy and pressure from the Governor's office, including from Harris, Dunnet Bay did not present sufficient evidence to raise a reasonable inference that IDOT had actually implemented a no-waiver policy. There is evidence that IDOT's District 8 EEO Officer Coleman advised contractors at a pre-letting meeting that Secretary Hannig said that no DBE waivers would be granted for the January 15, 2010 letting. However, IDOT did not have a no-waiver policy; instead, the undisputed evidence shows that it was IDOT's and Secretary Hannig's policy that requests for waivers would be subjected to high-level review and would not be granted unless shown to be appropriate. IDOT's Director of Highways Reed told Secretary Hannig that a no-waiver policy was not possible because it violated the law. The Secretary told Harris that IDOT would follow the law. So, too, IDOT's Regional Engineer for the Metra East area Lamie testified that although Secretary Hannig said that there would be no DBE waivers, in context he was not "saying no waivers under any circumstances will ever be issued" but that waiver requests would be reviewed at a high level and had to be supported by appropriate documentation. Significantly, even since Secretary Hannig took over, IDOT granted waivers. In 2009, it granted 32 of 58 requested waivers, and the other 26 contractors ultimately met contract goals; in 2010, IDOT granted 21 of 35 requested waivers, that is, 60% of the waiver requests. IDOT even granted a waiver in connection with the January 15 letting—the one at issue here—albeit after this lawsuit was filed. IDOT's unbroken record of granting waivers refutes any suggestion of a no-waiver policy. Dunnet Bay has

failed to raise a reasonable inference that IDOT implemented a no-waiver policy.

Dunnet Bay also challenges IDOT's rejection of its bid without determining whether it had made good faith efforts to meet the DBE goal and contests whether IDOT's reconsideration of its bid was meaningful in violation of 49 C.F.R. § 26.53. As an initial matter, the regulation provides that "[i]f the bidder/offeror does document adequate good faith efforts, you must not deny award of the contract on the basis that the bidder/offeror failed to meet the goal." *Id.* § 26.53(a)(2). IDOT ultimately determined that Dunnet Bay failed to document adequate good faith efforts; thus this provision was inapplicable and did not prevent IDOT from rejecting Dunnet Bay's bid.

Dunnet Bay asserts that reconsideration hearing officer Grunloh "was not an independent official with no role in the original determination," but it has offered no evidence to establish that Grunloh took any part in the initial determination that Dunnet Bay failed to make the DBE goal or make adequate good faith efforts. *See id.* § 26.53(d)(2). Nor has Dunnet Bay not shown that Grunloh, even if part of the "political leadership" and involved in pre-letting discouragement of waivers, was ineligible to serve as the reconsideration official.

Furthermore, Dunnet Bay argues that it made good faith efforts to meet the DBE goal and that the reasons given for IDOT's decision that it did not make adequate good faith efforts "do not hold up." Dunnet Bay focuses on its efforts in attending a pre-bid meeting, advertising with DBE networking organizations, soliciting DBEs by fax, telephoning DBEs, and posting subcontracting opportunities on its own web-

site. In total, Dunnet Bay solicited 796 companies for subcontracting work, 453 of which were DBEs.

A bidder "must show that it took all necessary and reasonable steps to achieve a DBE goal … which … could reasonably be expected to obtain sufficient DBE participation, even if they were not fully successful." 49 C.F.R. Pt. 26, Appendix A, § I. The regulations provide guidance for state recipients in deciding whether a bidder that did not meet a contract goal has demonstrated good faith efforts to meet the goal, instructing recipients to consider "the quality, quantity, and intensity of the different kinds of efforts that the bidder has made." *Id.*, § II. State recipients are provided a non-mandatory, non-exclusive, and non-exhaustive list of actions to be considered in determining whether a bidder made good faith efforts, including the following: (1) "Soliciting through all reasonable and available means (e.g. attendance at pre-bid meetings, advertising and/or written notices) the interest of all certified DBEs who have the capability to perform the work of the contract … [and] taking appropriate steps to follow up initial solicitations"; (2) "Selecting portions of the work to be performed by DBEs in order to increase the likelihood that the DBE goals will be achieved"; (3) "Providing interested DBEs with adequate information about the plans, specifications, and requirements of the contract"; (4) "Making efforts to assist interested DBEs in obtaining bonding, lines of credit, or insurance as required by the recipient or contractor"; (5) "Making efforts to assist interested DBEs in obtaining necessary equipment, supplies, materials, or related assistance or services"; and (6) "Effectively using the services of available minority/women community organizations; minority/women contractors' groups; local, state, and Federal minority/women business assistance

offices; and other organizations as allowed on a case-by-case basis to provide assistance in the recruitment and placement of DBEs." *Id.*, § IV, A–C and F–H. Further, the regulations instruct that "[i]n determining whether a bidder has made good faith efforts, you may take into account the performance of other bidders in meeting the contract." *Id.* § V. The regulation gives an example: "[W]hen the apparent successful bidder fails to meet the contract goal, but others meet it, you may reasonably raise the question of whether, with additional efforts, the apparent successful bidder could have met the goal." *Id.*

Reconsideration officer Grunloh's determination that Dunnet Bay failed to show good faith efforts is well-supported in the record. Grunloh testified that the reasons he determined Dunnet Bay failed to make good faith efforts were because it did not utilize IDOT's supportive services, and because the 2nd, 3rd, and 4th bidders all met the goal, whereas Dunnet Bay did not even come close. Grunloh also explained that Dunnet Bay's efforts were lacking with respect to the following areas included in the Appendix's list: conducting market research and soliciting through all reasonable and available means the interest of all certified DBEs; providing interested DBEs with adequate information about the contract; making efforts to assist interested DBEs in obtaining bonding, lines of credit, etc.; making efforts to assist interested DBEs in obtaining necessary equipment, supplies, etc.; and effectively using services of various minority organizations to provide assistance in recruitment and placement of DBEs.

The performance of other bidders in meeting the contract goal is listed in the regulation as a consideration when de-

ciding whether a bidder has made good faith efforts to obtain DBE participation goals, *see* 49 C.F.R. Pt. 26, App. A, § V, and was a proper consideration. Dunnet Bay argues that this factor should not be considered because IDOT left it off the For Bid List. While it is true that Dunnet Bay was left off the For Bid List, the fact that other bidders met the goal shows that the goal was attainable. Dunnet Bay also argues that IDOT had not previously considered contacting supportive services as necessary to establishing good faith, and that in Dunnet Bay's experience, supportive services were not helpful. However, utilization of supportive services is nonetheless a proper consideration under the regulation.

Dunnet Bay asserts that it employed the same efforts for the Eisenhower project that it successfully employed on other projects. Dunnet Bay is not among those contractors who often seek goal modification. The fact that its efforts failed to secure the DBE participation goal may suggest that it was hindered by its omission from the For Bid List. But the rebidding of the contract remedied that oversight.

Dunnet Bay also points out that Lyle thought it had demonstrated good faith efforts. Given the discretion in determining whether a contractor made good faith efforts, the fact that Lyle disagreed with Grunloh and initially thought Dunnet Bay showed good faith efforts does not raise a genuine issue of fact as to *Grunloh's* decision. In any event, Lyle subsequently expressed the view that Dunnet Bay could have done more to demonstrate good faith efforts, namely, by contacting supportive services as well as IDOT's Bureau of Small Business Enterprises and the district EEO officer.

Finally, it is true that IDOT failed to provide Dunnet Bay with "a written decision on reconsideration" explaining why

it found that Dunnet Bay did not make adequate good faith efforts to meet the DBE contract goal. 49 C.F.R. § 26.53(d)(4). However, this did not harm Dunnet Bay because IDOT did not award the contract based upon the January 15, 2010 bid letting. IDOT decided to re-let the contract instead; and Dunnet Bay's second bid met the DBE goal, but it was not the lowest bid.

## III. CONCLUSION

We AFFIRM the district court's judgment.