In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1827

MIDWEST FENCE CORPORATION,

*Plaintiff-Appellant*,

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 5627 — **Harry D. Leinenweber**, *Judge*.

ARGUED JANUARY 12, 2016 — DECIDED NOVEMBER 4, 2016

Before BAUER and HAMILTON, *Circuit Judges*, and
PETERSON, *District Judge*.[*]

HAMILTON, *Circuit Judge*. Plaintiff Midwest Fence Corporation challenges federal and state programs that offer advantages in highway construction contracting to disadvantaged business enterprises, known as DBEs. For purposes of

---

[*] The Honorable James D. Peterson, United States District Judge for the Western District of Wisconsin, sitting by designation.

federally funded highway construction, DBEs are small businesses that are owned and managed by "individuals who are both socially and economically disadvantaged," 49 C.F.R. § 26.5, primarily racial minorities and women, who have historically faced significant obstacles in the construction industry due to discrimination, § 26.67(a). Pursuant to the federal DBE program, states that accept federal highway funding must establish DBE participation goals for federally funded highway projects and must attempt to reach those goals through processes tailored to actual market conditions.

Plaintiff Midwest Fence is a specialty contractor that focuses its business on guardrails and fencing. Because of its size and specialization, it usually bids on projects as a subcontractor. Midwest Fence is not a DBE. It alleges that the defendants' DBE programs violate its Fourteenth Amendment right to equal protection under the law. Midwest Fence named as defendants the United States Department of Transportation (USDOT), the Illinois Department of Transportation (IDOT), and the Illinois State Toll Highway Authority (the Tollway).

Under the defendants' DBE programs, government contracting decisions may be made with reference to racial classifications, so these programs are subject to strict scrutiny. They can survive an equal protection challenge only if the defendants show that their programs serve a compelling government interest and are narrowly tailored to further that interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Remedying the effects of past or present discrimination can be a compelling governmental interest. *Shaw v. Hunt*, 517 U.S. 899, 909 (1996), citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498–506 (1989).

The district court granted the defendants' motions for summary judgment. *Midwest Fence Corp. v. U.S. Dep't of Transportation*, 84 F. Supp. 3d 705 (N.D. Ill. 2015). We affirm. We join other circuits in holding that the federal DBE program is facially constitutional. The program serves a compelling government interest in remedying a history of discrimination in highway construction contracting. The program provides states with ample discretion to tailor their DBE programs to the realities of their own markets and requires the use of race- and gender-neutral measures before turning to race- and gender-conscious ones. The IDOT and Tollway programs also survive strict scrutiny. These state defendants have established a substantial basis in evidence to support the need to remedy the effects of past discrimination in their markets, and the programs are narrowly tailored to serve that remedial purpose.

I.  *Legal and Factual Background*

    A.  *The Federal DBE Program*

Because we review a grant of summary judgment, we base our decision on facts that are either undisputed or reflect disputed evidence in the light reasonably most favorable to the non-moving party, Midwest Fence. *Stevens v. Interactive Financial Advisors, Inc.*, 830 F.3d 735, 739 (7th Cir. 2016); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We lay out in broad strokes the federal DBE program, which dates back to 1983 and has been reauthorized as recently as 2015 in the Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1101(b), 129 Stat. 1312, 1323–25 (2015); see also Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 1101(b), 126 Stat. 405, 414–16 (2012). After reviewing substantial data, testimony, and studies regarding highway

construction markets across the United States, Congress determined that discrimination continued to "pose significant obstacles for minority- and women-owned businesses seeking to do business" in those markets. § 1101(b)(1)(A), 126 Stat. at 415. Congress found there was a strong basis to continue the DBE program to try to remedy the ongoing effects of discrimination. § 1101(b)(1)(E), 126 Stat. at 415.

The DBE program establishes a national goal of spending at least 10% of federal highway funds in contracting with disadvantaged businesses. 49 C.F.R. § 26.41. DBEs are small businesses owned and controlled by socially and economically disadvantaged individuals. See § 26.5. Women and racial and ethnic minorities are presumed to be socially and economically disadvantaged, but they still must certify their disadvantaged status and provide economic evidence. § 26.67(a). The presumption can be rebutted. § 26.67(b). Presumption or not, no business can qualify as a DBE if the controlling owner's net worth exceeds $1.32 million or if the firm's gross receipts for the previous three fiscal years average more than $23.98 million per year. §§ 26.65(b), 26.67(a)(2)(i).

The federal program provides a framework for states to implement their own programs. States establish their own goals for DBE participation in federally funded transportation projects by (1) determining the relative availability of DBEs "ready, willing and able" to participate in those projects; and (2) examining local conditions to adjust the base figure if necessary. See § 26.45.

The regulations require states to use race- and gender-neutral means to the maximum extent possible to meet their goals, providing a non-exhaustive list of techniques for pro-

moting DBE participation. See § 26.51; see also § 26.5 (defining "race-neutral" to include gender-neutral). If a state cannot meet its goal through neutral means, it must set contract-specific DBE subcontracting goals on projects with subcontracting possibilities. § 26.51(d)–(e). The federal program expects states to monitor their DBE participation continuously. If a state is on track to exceed its DBE goal, it must reduce or eliminate contract goals as necessary, § 26.51(f)(2), and states may adjust their overall goals at any time to reflect changed circumstances, § 26.45(f)(1)(ii).

The federal program allows states to seek waivers of goal-setting provisions, § 26.15, and permits states themselves to decide on an individual basis whether bidders have made good faith efforts to satisfy a specific contract goal when they fall short, § 26.53(a)(2). Guidance as to what constitutes good faith efforts is found in 49 C.F.R. pt. 26 app. A. The federal regulations also require states to address overconcentration, meaning that states must ensure that the use of DBEs in a particular sector does not unduly burden non-DBEs in that sector. 49 C.F.R. § 26.33. The federal program also requires periodic reauthorization by Congress.

B. *IDOT's Implementation of the DBE Program*

In exchange for federal funding, IDOT has implemented a DBE program. State law requires Illinois to follow the federal program for solely state-funded projects and federally funded projects alike. 30 Ill. Comp. Stat. 575/6(d).

IDOT uses a number of race- and gender-neutral initiatives to facilitate DBE participation in its contracts, including a DBE mentoring program, a highway construction training program, a Small Business Initiative to encourage smaller

firms to participate in competitive bidding on prime con-
tracts, a Small Business Advisory Committee to provide IDOT
with input on small business issues, and an "unbundling" ef-
fort to reduce contract size so that a greater range of busi-
nesses can bid. IDOT also operates DBE resource centers,
works to eliminate barriers in the process required to qualify
firms to bid on prime contracts, hosts networking and indus-
try forums, and engages in numerous other efforts to draw
DBEs into the market.

These race- and gender-neutral initiatives have never ena-
bled IDOT to reach its participation goal (which is 22.77%), so
it also sets individual contract goals on many contracts. In
compliance with the federal regulations, IDOT sets those
goals on contracts that have subcontracting possibilities. An
IDOT engineer identifies the types of work included in the
prime contract and estimates the value of each line item. An
IDOT compliance officer then determines whether at least
two DBEs are available to perform the work for each line item.
The compliance officer then adds up the estimated cost of the
line items and divides it into the total contract cost to set a
DBE participation goal for the contract. For example, if
$100,000 of line items on a $1 million contract could be per-
formed by DBEs, the contract goal would be 10%. IDOT's Of-
fice of Business and Workforce Diversity examines the goal to
determine whether it is realistic.

These individual contract goals are important but not
rigid. Prime contractors can still win contracts if they are un-
able to meet DBE participation goals. The bidding process re-
quires each prime contractor to submit a sealed bid accompa-
nied by a list of the DBEs the contractor will use to achieve the
DBE goal. The lowest bidder is awarded the contract if it

meets the DBE goal or if IDOT determines that the bidder has made good faith efforts to do so. In the latter instance, IDOT grants a "front-end waiver" to the prime contractor. Whether a front-end waiver is appropriate depends on a variety of factors, including the contractor's method of soliciting DBEs, the follow-up and assistance the contractor offered DBEs, work with local officials, and so on.

Price also matters. According to IDOT, contractors need not use a more expensive DBE subcontractor if the price differential is too great. The unwritten "rule of thumb," according to IDOT's former deputy director of business and workplace diversity is 5%.

If a front-end waiver is denied, the prime contractor can appeal to IDOT's reconsideration officer. If reconsideration is denied, the contract goes to the next lowest bidder or is rebid. The practical availability of these front-end waivers is a focus of Midwest Fence's challenges to the Illinois program.

C. *The Tollway Program*

The Tollway adopted its own DBE program in 2005. Unlike IDOT, the Tollway received no federal funding during the relevant time, so it was not subject to the federal regulations. For the most part, though, its program mirrors IDOT's program. The Tollway treats a business as a DBE if it is certified under the federal regulations or if the City of Chicago or Cook County deems it a "Minority or Women-Owned Business."

Like IDOT, the Tollway uses race- and gender-neutral measures such as unbundling contracts, implementing a Small Business Initiative, partnering with other agencies to provide supportive services, conducting seminars on doing business with the Tollway, and making information available

on its website. Those measures have not produced substantial DBE participation, however, so the Tollway also sets DBE participation goals. It does so one contract at a time. Most of its goals are achieved through subcontract dollars. It sets those goals by comparing line items in its contracts to an availability table in a 2006 National Economic Research Associates study, which identifies DBE availability by industry code and serves as evidence supporting the Tollway's DBE program.

In theory, at least, the Tollway grants good faith efforts waivers based on criteria like those in the federal regulations. These criteria include whether the contractor solicited DBEs through all reasonable and available means, unbundled contract work items into economically feasible units, provided DBEs with sufficient information, engaged in good faith negotiations with DBEs, and so on. Cf. 49 C.F.R. pt. 26 app. A (federal guidance concerning good faith efforts). Midwest Fence again disputes the availability of those waivers in practice, calling the Tollway's contract goals *de facto* quotas.

D. *Procedural History*

Midwest Fence filed this lawsuit in 2010 alleging that the federal DBE program, IDOT's implementation of it, and the Tollway's own program violate its Fourteenth Amendment right to equal protection. Against the federal program, Midwest Fence asserts the following primary theories:

- The federal regulations prescribe a method for setting individual contract goals that places an undue burden on non-DBE subcontractors, especially certain kinds of subcontractors, including guardrail and fencing contractors like Midwest Fence.

- The presumption of social and economic dis-
  advantage is not tailored adequately to re-
  flect differences in the circumstances actu-
  ally faced by women and the various racial
  and ethnic groups who receive that pre-
  sumption.

- The federal regulations are unconstitution-
  ally vague, particularly with respect to
  "good faith efforts" to justify a front-end
  waiver.

Midwest Fence also asserts that IDOT's implementation of
the federal program is unconstitutional for essentially the
same reasons. Finally, Midwest Fence challenges the Tollway's
program on its face and as applied. Midwest Fence sought de-
claratory and injunctive relief from all defendants, and mon-
etary relief from IDOT and the Tollway.

Both sides moved for summary judgment, and the district
judge granted the defendants' motions. *Midwest Fence Corp.*,
84 F. Supp. 3d at 713. The judge found that Midwest Fence
had standing to bring most of its claims. *Id.* at 722–23. On the
merits, the district court upheld the facial constitutionality of
the federal DBE program. *Id.* at 729.

Turning to IDOT, the court concluded that Midwest Fence
did not rebut the evidence of discrimination that IDOT of-
fered to justify its program, *id.* at 733, and that Midwest Fence
had presented no "affirmative evidence" that IDOT's imple-
mentation unduly burdened non-DBEs, failed to make use of
race-neutral alternatives, or lacked flexibility, *id.* at 737.

The court noted that Midwest Fence's challenge to the Toll-
way's program paralleled the challenge to IDOT's program.

*Id.* It concluded that the Tollway, like IDOT, had established a "strong basis in evidence" for its program. *Id.* at 739. Finally, the district court concluded that, like IDOT's program, the Tollway's program imposed a minimal burden on non-DBEs, employed a number of race-neutral measures, and offered substantial flexibility. *Id.* at 740. Midwest Fence has appealed the final judgment. We have jurisdiction under 28 U.S.C. § 1291.

II. *Standing*

A. *Standing to Challenge the DBE Programs Generally*

Before addressing the merits of Midwest Fence's equal protection claims, we must address the defendants' argument that Midwest Fence lacks standing under Article III of the Constitution to bring them at all. See *Northeastern Florida Chapter of the Associated General Contractors v. City of Jacksonville*, 508 U.S. 656, 663 (1993) (standing is "an essential and unchanging part of the case-or-controversy requirement of Article III"), quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The district court found that Midwest Fence has standing, with one narrow exception.

Our standard of review depends on the procedural posture of the case, whether we are dealing with bare allegations in the pleadings, a paper record of evidence on summary judgment, or evidence at trial. The party invoking federal jurisdiction bears the burden of establishing standing, and the elements of standing must be supported with the quantum of evidence required at each successive stage of litigation. "At the summary-judgment stage, 'the plaintiff can no longer rest on … mere allegations, but must set forth by affidavit or other evidence specific facts.'" *Edgewood Manor Apartment Homes*,

*LLC v. RSUI Indemnity Co.*, 733 F.3d 761, 771 (7th Cir. 2013) (internal quotation marks omitted), quoting *Defenders of Wildlife*, 504 U.S. at 561; accord, *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801–02 (7th Cir. 2016); *Hummel v. St. Joseph County Board of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Here, defendants moved for summary judgment in part on the basis that Midwest Fence lacks standing, so the legal issue is whether Midwest Fence offered evidence that could support a finding of standing.

To invoke a federal court's jurisdiction, a plaintiff must allege and then show (1) injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *Northeastern Florida*, 508 U.S. at 663–64. *Northeastern Florida* involved a race-conscious ordinance enacted to increase participation in public contracting. The issue was whether standing requires a plaintiff challenging such a law to show that it would have been awarded the contract but for the existence of the race-conscious law. The Court said no:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier *need not allege that he would have obtained the benefit but for the barrier* in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Id.* at 666 (emphasis added).

The plaintiff "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* Causation and redressability follow from this definition of injury: causation, because the theory is that the policy prevents equal competition; redressability, because invalidating the policy will again place the plaintiff on equal footing for competitive purposes. See *id.* at 666 n.5.

The district court correctly found that Midwest Fence has standing under the *Northeastern Florida* approach. By alleging and then offering evidence of lost bids, decreased revenue, and difficulties keeping its business afloat as a result of the DBE program and its inability to compete for contracts on an equal footing with DBEs, Midwest Fence showed both causation and redressability. *Midwest Fence Corp. v. U.S. Dep't of Transportation*, No. 10 C 5627, 2011 WL 2551179, at *5–6, *9 (N.D. Ill. June 27, 2011); *Midwest Fence Corp.*, 84 F. Supp. 3d at 722.

Defendants contend that our decision in *Dunnet Bay Construction Co. v. Borggren*, 799 F.3d 676 (7th Cir. 2015), defeats Midwest Fence's standing here. While some language in *Dunnet Bay* might be read that way, the standing holding in that decision turned on an unusual and complex set of facts under which it would have been impossible for the plaintiff to have won the contract it sought and for which it sought damages. Dunnet Bay's low bid on an IDOT highway resurfacing contract had been rejected for failing to meet the contract's DBE goal, but its bid was also 16% above the program estimate. Moreover, Dunnet Bay had been inadvertently omitted from IDOT's authorized bidder list, an omission that may have cost it some DBE subcontractor quotes. *Id.* at 683–84, 692. Under

those circumstances, IDOT chose to rebid the contract. *Id.* at 692. Since IDOT "did not award the contract to anyone under the first letting and re-let the contract," Dunnet Bay "suffered no injury because of the DBE program in the first letting." *Id.* at 695.

This case is readily distinguishable from *Dunnet Bay*. Here, Midwest Fence seeks prospective relief that would enable it to compete with DBEs on an equal basis more generally. That is sufficient under *Northeastern Florida*. Any suggestion in *Dunnet Bay* to the contrary would be inconsistent with *Northeastern Florida* and must be read as dicta. We need not consider here the sorts of details of particular bidding procedures for particular contracts as in *Dunnet Bay*.

B. *Standing to Challenge the Target Market Program*

Although the district court determined that Midwest Fence has standing generally, the court carved out one narrow exception, finding that Midwest Fence lacks standing to challenge the IDOT "target market program." That program was set up "to remedy particular incidents and patterns of egregious race or gender discrimination." 20 Ill. Comp. Stat. 2705/2705-600. Under the program, certain contracts may be designated "target market contracts" to remedy that discrimination. Target market remedial measures can include reserving certain work for performance by minority- or female-owned businesses; implementing formation and bidding procedures that encourage bidding by DBEs; setting separate participation goals for a particular contract or contracts; establishing incentives for achieving those goals; and setting aside particular contracts exclusively for DBEs. 44 Ill. Admin. Code § 6.830(a).

No evidence in the record shows that Midwest Fence bid on or lost any contracts subject to the target market program. IDOT has not yet set aside *any* guardrail and fencing contracts under the target market program. Midwest Fence has therefore not shown that it has suffered from an "inability to compete on an equal footing in the bidding process" with respect to contracts within the target market program. *Northeastern Florida*, 508 U.S. at 666. The possibility that IDOT might someday include a guardrail and fencing contract in the target market program does not give Midwest Fence standing now. The possible injury Midwest Fence fears is not one of "sufficient immediacy and ripeness to warrant judicial intervention." *Id*. at 667, quoting *Warth v. Seldin*, 422 U.S. 490, 516 (1975).

III. *Claims Against the United States Department of Transportation*

A. *Facial Versus As-Applied Challenge*

The federal DBE program authorizes and to some extent requires state governments to rely on racial classifications in awarding government contracts. Accordingly, the equal protection challenge requires the government to show that the program can survive strict scrutiny, meaning that the program serves a compelling government interest and is narrowly tailored to advance that interest. *Adarand Constructors*, 515 U.S. at 235; *Northern Contracting, Inc. v. Illinois*, 473 F.3d 715, 720 (7th Cir. 2007). Remedying the effects of past or present discrimination can be a compelling governmental interest. *Shaw*, 517 U.S. at 909. In this appeal, Midwest Fence does not challenge the national compelling interest in remedying past discrimination. We therefore focus on whether the federal program is narrowly tailored.

Before digging into the merits of Midwest Fence's challenge to the federal program, we must address another preliminary issue: whether Midwest Fence can maintain an as-applied challenge against USDOT and the federal program or whether, as the district court held, the claim against USDOT is limited to a facial challenge. Midwest Fence sought a declaration that the federal regulations are unconstitutional as applied in Illinois. The district court rejected the attempt to bring that claim against USDOT, treating it as applying only to IDOT. *Midwest Fence*, 84 F. Supp. 3d at 718, citing *Sherbrooke Turf, Inc. v. Minnesota Dep't of Transportation*, 345 F.3d 964, 973 (8th Cir. 2003). We agree.

A facial challenge ordinarily requires a plaintiff to show there is no set of circumstances under which the challenged statutes or regulations can operate constitutionally. See *United States v. Salerno*, 481 U.S. 739, 745 (1987). Midwest Fence's argument seeks to turn this standard on its head, for it amounts to an argument that because (Midwest Fence contends) the federal regulations are applied unconstitutionally in Illinois, the regulations themselves are unconstitutional.

A principal feature of the federal regulations is their flexibility and adaptability to local conditions. See, e.g., 49 C.F.R. § 26.45 (states to set DBE participation goals); § 26.33 (states to devise "appropriate measures" to address overconcentration). That flexibility is important to the constitutionality of the program. As noted, such a race- and gender-conscious program must be narrowly tailored to serve the compelling governmental interest. See *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality opinion) (in determining whether race-conscious remedies are appropriate, courts consider,

among other factors, the "flexibility and duration of the relief"); *Western States Paving Co. v. Washington State Dep't of Transportation*, 407 F.3d 983, 993 (9th Cir. 2005) (citing *Paradise* factors, including flexibility, in analyzing narrow tailoring of federal DBE program); *Sherbrooke Turf*, 345 F.3d at 971 (same). The flexibility in the regulations makes the states, not USDOT, primarily responsible for implementing their own programs in ways that comply with the Equal Protection Clause. It makes sense, then, that a state, not USDOT, is the correct party to defend a challenge to its implementation of its program. The district court did not err by treating the claims against USDOT as only a facial challenge to the federal regulations.

B.  *Narrow Tailoring*

The Eighth, Ninth, and Tenth Circuits have all found the federal DBE program constitutional on its face. See *Western States Paving*, 407 F.3d at 995; *Sherbrooke Turf*, 345 F.3d at 967–68; *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1155 (10th Cir. 2000). We agree with these other circuits.

The disputed issue here is whether the program is narrowly tailored to further a compelling governmental interest. *Adarand Constructors*, 515 U.S. at 235. Narrow tailoring requires "a close match between the evil against which the remedy is directed and the terms of the remedy." *Builders Ass'n of Greater Chicago v. County of Cook*, 256 F.3d 642, 646 (7th Cir. 2001). Like the district court, we look to the *Paradise* factors: (a) "the necessity for the relief and the efficacy of alternative [race-neutral] remedies," (b) "the flexibility and duration of the relief, including the availability of waiver provisions," (c) "the relationship of the numerical goals to the relevant labor [or here, contracting] market," and (d) "the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171; see also

*Western States Paving*, 407 F.3d at 993 (citing *Paradise* factors in analyzing narrow tailoring of federal DBE program); *Sherbrooke Turf*, 345 F.3d at 971 (same); *Adarand Constructors*, 228 F.3d at 1177 (same). The Tenth Circuit in *Adarand* added to the mix the question of over- or under-inclusiveness. 228 F.3d at 1177, citing *Croson*, 488 U.S. at 508.

First, the federal DBE program requires states to meet as much as possible of their overall DBE participation goals through race- and gender-neutral means. 49 C.F.R. § 26.51(a). If a state projects it can meet its entire DBE participation goal for the year through neutral means, it "*must* implement [its] program without setting contract goals during that year," unless such goals later become necessary. § 26.51(f)(1) (emphasis added). A state that projects it is likely to exceed its overall DBE participation goal "*must* reduce or eliminate the use of contract goals" as necessary to avoid exceeding its overall goal. § 26.51(f)(2) (emphasis added).

Next, on its face, the federal program is both flexible and limited in duration. Quotas, one hallmark of an inflexible system, are flatly prohibited, see § 26.43, and states may apply for waivers, including waivers of "any provisions regarding administrative requirements, overall goals, contract goals or good faith efforts," § 26.15(b). The regulations also require states to remain flexible as they administer the program over the course of the year. For instance, they must continually reassess their DBE participation goals and whether contract goals are necessary to meet those overall goals. § 26.51(f). If a state falls behind its DBE participation goal, it may increase its use of contract goals—but if it is on track to exceed its participation goal, it "must reduce or eliminate" its reliance on those measures. § 26.51(f)(2).

States need not set a contract goal on every USDOT-assisted contract, nor must they set those goals at the same percentage as the overall participation goal. § 26.51(e)(2). "The goal for a specific contract may be higher or lower than that percentage level of the overall goal, depending on such factors as the type of work involved, the location of the work, and the availability of DBEs" for that particular contract. *Id.* On a broader scale, states may also adjust their overall participation goals if circumstances change. § 26.45(f)(1)(ii).

Together, all of these provisions allow for significant and ongoing flexibility. States are not locked into their initial DBE participation goals. Their use of contract goals is meant to remain fluid, reflecting a state's progress toward its overall DBE goal. As for duration, Congress has repeatedly reauthorized the program after taking new looks at the need for it. See, e.g., Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1101(b), 129 Stat. 1312, 1323–25 (2015). As noted above, states must monitor progress toward meeting DBE goals on a regular basis and alter the goals if necessary. They must stop using race- and gender-conscious measures if those measures are no longer needed.

The numerical goals are also tied to the relevant markets. The federal program features a national "aspirational goal" of 10 percent of funds going to DBEs, but that goal "does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent." 49 C.F.R. § 26.41(c); see also § 26.45(b). Rather, the regulations prescribe a process for setting a DBE participation goal that focuses on information about the specific

market and that is intended to reflect "the level of DBE participation you would expect absent the effects of discrimination." § 26.45(b). The regulations thus instruct states to set their DBE participation goals to reflect actual DBE availability in their jurisdictions, as modified by other relevant factors like DBE capacity.

Midwest Fence focuses on the burden on third parties and argues the program is over-inclusive. But the regulations include mechanisms to minimize the burdens the program places on non-DBE third parties. A primary example is supplied in § 26.33(a), which requires states to take steps to address overconcentration of DBEs in certain types of work if the overconcentration unduly burdens non-DBEs to the point that they can no longer participate in the market. Standards can be relaxed if uncompromising enforcement would yield negative consequences. For instance, states can obtain waivers if special circumstances make the state's compliance with part of the federal program "impractical," § 26.15(a), and contractors who fail to meet a DBE contract goal can still be awarded the contract if they have documented "good faith efforts to meet the goal," § 26.53(a)(2).

Against this backdrop, Midwest Fence argues that a "mismatch" in the way contract goals are calculated results in a burden that falls disproportionately on specialty subcontractors. Under the federal regulations, states' overall goals are set as a percentage of all their USDOT-assisted contracts. See § 26.45. However, states may set contract goals "*only* on those [USDOT]-assisted contracts that have subcontracting possibilities." § 26.51(e)(1) (emphasis added). This makes sense: if a contract has no subcontracting possibilities, then either it will be performed by a DBE or it will not; there is nothing in

between. Midwest Fence argues that because DBEs must be small, see § 26.65, they are generally unable to compete for prime contracts. This, Midwest Fence argues, is the "mismatch." Where contract goals are necessary to meet an overall DBE participation goal, those contract goals are met almost entirely with *subcontractor* dollars, which places a heavy burden on non-DBE subcontractors while leaving non-DBE prime contractors in the clear.

To understand how, imagine a state's DBE participation goal is 10%, so that DBEs should receive 10% of "all Federal-aid highway funds [the state] will expend in FHWA-assisted contracts in the forthcoming three fiscal years." § 26.45(e)(1). Let's say the state will spend $100 million. To meet its overall goal, $10 million should go to DBEs. Let's also assume the state cannot achieve that goal with race-neutral measures and so must turn to contract goals. Then suppose that half the contracts have no subcontracting possibilities, rendering them ineligible for contract goals. Now, instead of drawing the $10 million in DBE funds from the total $100 million, the state looks only to the $50 million in contracts with subcontracting possibilities to meet its DBE contract goals. Furthermore, if of that $50 million, only $20 million of work can be performed by subcontractors (and thus by DBEs), the $10 million will be drawn from that pool and that pool alone. Thus, in this example, although the participation goal calls for DBEs to receive 10% of *total* funds, in practice it requires the state to award DBEs fully *half* of the available subcontractor funds while taking no business away from prime contractors. This, according to Midwest Fence, is the "mismatch" that imposes a disproportionate burden on specialty subcontractors like itself.

This prospect is troubling. The DBE program can impose a disproportionate burden on small, specialized non-DBE subcontractors, especially when compared to larger prime contractors with whom DBEs would compete less frequently. This potential for a disproportionate burden, however, does not render the program facially unconstitutional. The constitutionality of the program depends on how it is implemented.

Moreover, some of the suggested race- and gender-neutral means that states can use under the federal program are designed to increase DBE participation in prime contracting and other fields where DBE participation has historically been low. See § 26.51(b)(1), (7). For instance, the regulations specifically encourage states to make contracts "more accessible to small businesses." § 26.51(b)(1). Suggested means include establishing "a race-neutral small business set-aside for prime contracts under a stated amount," § 26.39(b)(1); facilitating the "ability of consortia or joint ventures consisting of small businesses, including DBEs, to compete for and perform prime contracts," § 26.39(b)(4); and "ensuring that a reasonable number of prime contracts are of a size that small businesses, including DBEs, can reasonably perform," § 26.39(b)(5). As USDOT argues, the federal program "explicitly contemplates [DBEs'] ability to compete equally by requiring States to report DBE participation as prime contractors and makes efforts to develop that potential."

These measures to increase the participation of DBEs in prime contracting will not always be sufficient. They may in fact rarely be sufficient. States will continue to resort to contract goals that open the door to the type of mismatch that Midwest Fence describes. But the program on its face does not

compel an unfair distribution of burdens. Small specialty con-
tractors may have to bear at least some of the burdens created
by remedying past discrimination under the federal DBE pro-
gram, but the Supreme Court has indicated that innocent
third parties may constitutionally be required to bear at least
some of the burden of the remedy. *Wygant v. Jackson Board of
Education*, 476 U.S. 267, 281 (1986) (plurality opinion).

Midwest Fence argues that the federal program is over-in-
clusive because it grants preferences to groups without ana-
lyzing the extent to which each group is actually disadvan-
taged. This is essentially an attack on a report by Dr. Jon Wain-
wright, which reviewed 95 disparity and availability studies
across 32 states between the years 2000 and 2012. Many of
Midwest Fence's criticisms are best analyzed as part of its as-
applied challenge against the state defendants, but we men-
tion two federal-specific arguments briefly.

First, Midwest Fence contends that nothing proves that the
disparities Dr. Wainwright relied upon were caused by dis-
crimination. But to justify its program, USDOT does not need
definitive proof of discrimination. Instead it must have a
"strong basis in evidence" that remedial action is necessary to
remedy past discrimination. *Wygant*, 476 U.S. at 277; see also
*H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 241 (4th Cir. 2010) ("A
state need not conclusively prove the existence of past or pre-
sent racial discrimination to establish a strong basis in evi-
dence for concluding that remedial action is necessary.").

Second, Midwest Fence attacks what it perceives as the
one-size-fits-all nature of the program, suggesting that the
regulations ought to provide different remedies for different
groups because those groups are disadvantaged to different
degrees. The table in Dr. Wainwright's report on which the

district court relied to find widespread disparities shows varying levels of disparity for different groups, Midwest Fence argues, so the federal program should offer different solutions to each group. Instead, it offers a single approach to all the disadvantaged groups, regardless of degree.

Midwest relies on *Builders Ass'n of Greater Chicago*, 256 F.3d at 647, in which we held unconstitutional a set-aside ordinance that used a presumption of discrimination "merely on the basis of having an ancestor who had been born in the Iberian peninsula," where there was simply no evidence in the record of past discrimination against that group. This case is different. Though the table in question reflects some variation in the extent of disadvantage, Midwest has not argued that any of the groups in the table were not in fact disadvantaged at all. Though the minority groups in question are given presumptive DBE status across the board, the federal regulations ultimately require individualized determinations. Each presumptively disadvantaged firm owner must certify that he or she "is, in fact, socially and economically disadvantaged," 49 C.F.R. § 26.67(a)(1), and that presumption can be rebutted, § 26.67(b). In this way, the federal program requires states to extend benefits only to those who are actually disadvantaged.

We agree with the district court and with the Eighth, Ninth, and Tenth Circuits that the federal DBE program is narrowly tailored on its face, so it survives strict scrutiny.

IV. *Claims Against IDOT and the Tollway*

A. *Motion to Exclude Supplemental Record on Appeal*

Before we evaluate the merits of Midwest Fence's equal protection claims against IDOT and the Tollway, we must re-

solve a dispute about the evidence properly before us on appeal. Before oral argument, Midwest Fence took the unusual step of supplementing the record with evidence that was not before the district court when it made its decision. The state defendants have moved to exclude that evidence from the appellate record. We decided to take up that motion with the merits, and we now grant the motion to exclude.

The evidence in question is a disparity study commissioned by the Tollway in 2013 and performed by Colette Holt & Associates. The Holt study was underway during the district court proceedings. Parts of the study had been completed, and in the district court the Tollway relied on some of that completed analysis to support its claim that women and minorities continued to face barriers in the Illinois construction market, including wage differentials and decreased likelihood of forming their own construction businesses.

The district court decision of March 24, 2015 referred to portions of the Holt study in the record. See *Midwest Fence*, 84 F. Supp. 3d at 737–38. On November 13, 2015, after the defendants had filed their briefs on appeal but before Midwest Fence filed its reply brief, the Holt study was completed. Midwest Fence filed a motion in the district court to supplement the record with the complete Holt study, and on December 10, 2015, the court granted the motion to that effect. Five days later, the Illinois defendants moved in this court to exclude the supplemental evidence.

Midwest Fence explained at oral argument that it wants one specific piece of information in the record: a chart that lays out disparity ratios in the construction industry for each of several demographic groups. A disparity ratio, also called

a disparity index, reflects a group's participation in contracting opportunities.

Federal Rule of Appellate Procedure 10(e) governs correction or modification of the record on appeal. It provides no legal basis for this appellate court to consider the complete Holt study. *Borden, Inc. v. Federal Trade Comm'n*, 495 F.2d 785, 788 (7th Cir. 1974) ("Rule 10(e) does not give this court authority to admit on appeal any document which was not made a part of the record in the district court."). The record without the complete Holt study "truly discloses what occurred in the district court," and nothing was "omitted from or misstated in the record by error or accident," Fed. R. App. P. 10(e).

As a general rule, we will not consider evidence on appeal that was not before the district court when it rendered its decision. Adding new evidence would essentially convert an appeal into a collateral attack on the district court's decision. *United States v. Banks*, 405 F.3d 559, 567 (7th Cir. 2005); see also *Shasteen v. Saver*, 252 F.3d 929, 934 n.2 (7th Cir. 2001) ("[T]he purpose of Rule 10(e) is to ensure that the court on appeal has a complete record of the proceedings leading to the ruling appealed from, not to facilitate collateral attacks on the verdict."), quoting *United States v. Hillsberg*, 812 F.2d 328, 336 (7th Cir. 1987); *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 337 (7th Cir. 1988) ("Even the results of simple math are inappropriate for this court to consider on appeal, however, if the results were not initially presented to the district court.").

Midwest Fence urges us to make an exception for two reasons: (1) the information was within not its control but the Tollway's; and (2) the Tollway should not be permitted to cherry-pick portions of the Holt study that support its position when other portions cut against its use of race-conscious

measures. Midwest Fence's frustration is understandable. But this is no reason to permit a collateral attack on the district court's judgment based on data that the district court never considered and that were not even available to the Tollway when it began to defend this lawsuit and its DBE program. The Illinois defendants deserve an opportunity to scrutinize their program in light of the Holt study, which itself should be considered in the context of all the evidence they have about the market in Illinois, and to take action—or not—accordingly. The entire Holt study may be useful to one side or another in a future challenge to the IDOT and Tollway programs, but it is not available here. We grant the motion to exclude the Holt study and do not consider it in this appeal.

B.  *Void for Vagueness?*

Midwest Fence argues that the federal regulations are unconstitutionally vague as applied by IDOT. The regulations provide that if a state establishes a DBE contract goal, it must award the contract to a bidder who makes "good faith efforts" to meet that goal, meaning either actually obtaining sufficient DBE participation or documenting adequate efforts to do so. 49 C.F.R. § 26.53(a). Midwest Fence contends that the regulations fail to specify what good faith efforts a contractor must make to qualify for a waiver.

Appendix A of 49 C.F.R., Part 26, provides direction. It says that a state's "determination concerning the sufficiency of the firm's good faith efforts is a judgment call." It provides a list of actions a state should consider as part of a bidder's good faith efforts, emphasizing that it is "not intended to be a mandatory checklist, nor is it intended to be exclusive or exhaustive." *Id.*, ¶ IV. Midwest Fence specifically attacks ¶ IV(D)(2), which addresses possible cost differentials in the

use of DBEs: "the fact that there may be some additional costs involved in finding and using DBEs is not in itself sufficient reason for a bidder's failure to meet the contract DBE goal, as long as such costs are reasonable." At the same time, the regulation assures prime contractors that they need not accept higher price quotes from DBEs "if the price difference is excessive or unreasonable." *Id.* This language on when a difference in price is significant enough to justify falling short of the DBE contract goal is too vague, according to Midwest Fence.

Vagueness doctrine grew out of the due process clauses of the Fifth and Fourteenth Amendments. It seeks to enforce the principle that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. —, —, 132 S. Ct. 2307, 2317 (2012). This doctrine is a poor fit for Midwest Fence's complaint. The regulations on good faith efforts do not threaten non-DBE subcontractors or prime contractors with punishment. At worst, a prime contractor who misjudges the extent of its good faith efforts will lose out on a contract, but even then only after an opportunity for administrative reconsideration, 49 C.F.R. § 26.53(d).

Midwest Fence's approach is problematic for another reason. It argues that the lack of more specific guidance *decreases* the program's flexibility, but we do not see how this is so. Appendix A allows a bidder to use "good business judgment" to decide whether it should select a DBE for subcontracting; it cannot rely exclusively on the existence of "some additional costs" to reject the DBE, but it can reject an excessively high quote from a DBE. 49 C.F.R. pt. 26 app. A, ¶ IV(D)(2). If the standard seems vague, that is likely because it was meant to be flexible. What price differential is "unreasonable" may

well vary from project to project—even between subcontractors on the same contract—based on capability, capacity, or other factors. A more rigid standard could easily be too arbitrary and hinder prime contractors' ability to adjust their approaches to the circumstances of particular projects.

Midwest Fence's real argument seems to be that in practice, prime contractors err too far on the side of caution, granting significant price preferences to DBEs instead of taking the risk of losing a contract for failure to meet the DBE goal. Midwest Fence contends this creates a *de facto* system of quotas because contractors believe they must meet the DBE goal in their bids or lose the contract. But Appendix A to the regulations cautions against this very approach. See *id.*, ¶ III ("The Department also strongly cautions you against requiring that a bidder meet a contract goal (i.e., obtain a specified amount of DBE participation) in order to be awarded a contract, even though the bidder makes an adequate good faith efforts showing. This rule specifically prohibits you from ignoring bona fide good faith efforts.").

Flexibility and the availability of waivers affect whether a program is narrowly tailored. The regulations caution against quotas; provide examples of good faith efforts prime contractors can make and states can consider; and instruct a bidder to use "good business judgment" to decide whether a price difference between a DBE and a non-DBE subcontractor is reasonable or excessive in a given case. For purposes of contract awards, this is enough to "give fair notice of conduct that is forbidden or required," *Fox Television Stations*, 567 U.S. at —, 132 S. Ct. at 2317.

C. *Equal Protection Challenge*

  1.  *Compelling Interest with Strong Basis in Evidence*

Turning to the merits of Midwest Fence's equal protection claims based on the actions of IDOT and the Tollway, the first issue is whether the state defendants had a compelling interest in enacting their programs, one with a "strong basis in evidence." See *Croson*, 488 U.S. at 510, quoting *Wygant*, 476 U.S. at 277. We and other circuits have held that a state agency is entitled to rely on the federal government's compelling interest in remedying the effects of past discrimination to justify its own DBE plan for highway construction contracting. *Northern Contracting*, 473 F.3d at 720–21; see also *Western States Paving*, 407 F.3d at 997; *Sherbrooke Turf*, 345 F.3d at 970. However, not all of IDOT's contracts are federally funded, and the Tollway did not receive federal funding at all during the period covered by the complaint. With respect to those contracts, at least, we must consider whether IDOT and the Tollway have established a strong basis in evidence to support their programs. We start with IDOT's evidence and then turn to the Tollway's evidence. We then address Midwest's criticisms of the defendants' evidence.

  a.  *IDOT Program*

IDOT relies first on a DBE availability study performed in 2004 by National Economic Research Associates (NERA). The study, led by Dr. Wainwright, defined IDOT's construction market by identifying all highway and road contracts between 1996 and 2000 and identifying the item-level cost estimates for each contract; categorizing line items by Standard Industrial Classification codes and calculating a dollar-based

weight to apply to those categories; eliminating Standard In-
dustrial Classification codes that offered negligible opportu-
nities; and calculating geographic weights in Illinois based on
contractor and subcontractor ZIP codes. It then estimated
businesses in the market using Dun & Bradstreet's *Market-
Place*, a database of U.S. businesses; collected DBE lists from
IDOT and other entities to find any DBEs that *MarketPlace*
might have missed; and adjusted the figures to account for
possibly erroneous DBE classifications. Applying the Stand-
ard Industrial Classification and geographic weights to the
number of DBEs yielded a DBE availability of 22.77% across
all projects. The 2004 NERA study would have adjusted the
availability figure upward slightly to account for artificially
low totals caused by discrimination that keeps minorities and
women out of the market or makes their businesses more
likely to fail, but IDOT ultimately adopted the 22.77% figure.[1]

Next, IDOT commissioned Mason Tillman Associates to
perform a full disparity study, as distinct from an availability

---

[1] IDOT later updated its availability data to reflect a 2013 availability
study by Mason Tillman Associates. The study reviewed contracts
awarded between July 1, 2010 and June 30, 2011. Using the same methods
it employed in its disparity study, discussed later in this section, Mason
Tillman calculated that 33.01% of willing and able construction subcon-
tractors were DBEs. The updated availability study also included addi-
tional anecdotal evidence of race and gender barriers derived from inter-
views with business owners in Illinois and a regression analysis of other
non-highway construction industries that found "statistically significant
disparities in the likelihood of owning a business … for minorities and
females," "statistically significant disparities in business earnings for mi-
norities, females, and persons with disabilities," and statistically signifi-
cant disparities in the likelihood of being denied a business loan for Afri-
can Americans and Hispanics.

study. The study was published in 2011. Mason Tillman collected information about prime contractors and subcontractors involved with construction, architecture, and engineering contracts awarded between January 1, 2006 and December 31, 2008. It began by (1) collecting utilization records to determine the extent to which IDOT used DBEs and non-DBEs and (2) defining IDOT's market area. It then identified businesses that were willing and able to provide needed services. Firm availability was weighted to reflect IDOT's contracting pattern, with weights assigned to different areas based on the percentage of dollars expended in those areas. The study then determined whether there was a statistically significant under-utilization of DBEs by calculating the dollars each group would be expected to receive based on availability; calculating the difference between the expected and actual amount of contract dollars received; and ensuring that results were not attributable to chance.

The study found that DBEs were significantly under-utilized as prime contractors. They made up 25.55% of prime contractors in the construction field. They received only 9.13% of prime contracts valued below $500,000 and only 8.25% of the available prime contract dollars in that range. With respect to even smaller prime contracts—those valued at $25,000 or less—DBEs received just 8.96% of contracts, amounting to 10.38% of available dollars. For prime contracts under $500,000, the disparity ratio was 0.32; for prime contracts for $25,000 or less, the disparity ratio was 0.41. Both ratios were statistically significant. A figure below 0.80 is generally considered solid evidence of systematic under-utilization calling for affirmative action to correct it. In the realm of construction subcontracting, the study showed that DBEs made up 29.24% of available subcontractors. In the construction industry, they

received 44.62% of available subcontracts, but those subcontracts amounted to only 10.65% of available subcontracting dollars. This yielded a statistically significant disparity ratio of 0.36, again low enough to signal systemic under-utilization.

IDOT has relied on additional data to justify its program. For example, IDOT conducted a "zero-goal" experiment in 2002 and 2003, when it did not apply DBE goals to contracts that would otherwise have featured them. Without contract goals, the share of the contracts' value that DBEs received dropped dramatically, to just 1.5% of the total value of the contracts. See *Northern Contracting*, 473 F.3d at 719. Another informal analysis in IDOT's 2012–15 goal-setting report showed that of 4,129 construction, architecture, and engineering contracts IDOT awarded from 2006 through 2008, more than half were advertised without a DBE goal. In those contracts advertised without a DBE goal, the DBE subcontractor participation rate was just 0.84%. The 2004 NERA availability study did not itself analyze market disparities, but it did review a number of past Illinois-area disparity studies commissioned in the wake of *Croson*. All found "pervasive and systemic discrimination against minorities and women." While less rigorous, the data from these studies help show that IDOT had a strong basis in evidence to adopt its program.

b. *Tollway Program*

To show a basis for its program, the Tollway relies primarily on a 2006 NERA study that was limited to the Tollway's contracting market area. NERA first determined DBE availability in the Tollway's marketplace via what it calls a "custom census" process, creating a database of representative projects, identifying geographic and product markets, counting businesses in those markets, identifying and verifying which

businesses are minority- and woman-owned, and verifying the ownership status of all other firms. NERA then examined the Tollway's historical contract data and reported its DBE utilization between 2000 and 2005 as a percentage of contract dollars. Finally, it compared DBE utilization and DBE availability, coming up with disparity indices divided by race and sex, as well as by industry group.

In the construction industry, the 2006 NERA study found that out of 115 disparity indices, 80 showed statistically significant under-utilization of DBEs. In fact, in 61 cases, the disparity index was both zero and statistically significant, meaning the Tollway did not use any DBEs at all in that category.

The study then discussed statistical disparities in earnings and the formation of businesses by minorities and women, concluding: "In almost every instance examined, a statistically significant adverse impact on earnings is observed in both the economy at large and in the construction and construction-related professional services sector." The study also found that women and minorities are not as likely to start their own businesses "and that minority business formation rates would likely be substantially and significantly higher if markets operated in a race- and sex-neutral manner."

The 2006 NERA study also used regression analysis to assess differences in wages, business-owner earnings, and business-formation rates between white men and minorities and women in the wider construction economy. The study found statistically significant disparities remained between white men and other groups, even controlling for various independent variables such as age (as a proxy for experience), education, location, industry affiliation, and time. The disparities,

according to NERA, were consistent with a market affected by discrimination.

Like IDOT, the Tollway has also presented additional evidence to justify its DBE program. Before adopting the program, the Tollway set aspirational participation goals on a small number of contracts. Those attempts failed. In 2004, the Tollway did not award a single prime contract or subcontract to a DBE, and the DBE participation rate in 2005 was 0.1% across all construction contracts. Finally, in adopting its program, the Tollway also considered anecdotal evidence that was presented in *Northern Contracting*—namely, the disturbing testimony of several DBE owners regarding barriers that they themselves faced. See *Northern Contracting, Inc. v. Illinois*, No. 00 C 4515, 2005 WL 2230195, at *13–14 (N.D. Ill. Sept. 8, 2005), *aff'd*, 473 F.3d 715 (7th Cir. 2007).

### c.   *Midwest Fence's Criticisms*

Most of Midwest Fence's criticisms of the defendants' evidence stem from a report prepared by its expert, labor economist Dr. Jonathan Guryan. Midwest Fence argues that Dr. Guryan's attacks on the various reports in the record create a triable issue of fact as to whether IDOT and the Tollway had the requisite "strong basis in evidence" to conclude that race- and gender-conscious remedial action was necessary.

Two sections of Dr. Guryan's report provide the most substantial bases for criticism of the defendants' evidence. In Section 6.1, Dr. Guryan argues that NERA has failed to account for DBEs' readiness, willingness, and ability to do business with IDOT and the Tollway, and that Mason Tillman's method of assessing readiness and willingness is flawed. In Section 6.2, Dr. Guryan argues that the Mason Tillman study failed to

account for DBEs' relative capacity, meaning a firm's ability to take on more than one contract at a time.[2] See *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1044 (Fed. Cir. 2008) (disparity studies took account of firm size but failed to account for relative capacities of firms to bid for more than one contract at a time). Other sections of the report present less substantial critiques: (1) the existence of the DBE program may bias availability upward because it creates an incentive for DBEs to do business with the public sector; (2) the existence of the DBE program may cause participants to alter their behavior, such that "[a]nything observed about the public sector may be affected by the DBE program"; and (3) the data may be stale.

One major problem with Dr. Guryan's report is that he did not perform any substantive analysis of his own. As the district court noted, the evidence he offered is "speculative at best." *Midwest Fence*, 84 F. Supp. 3d at 733. For example, he noted only that it was "unclear" whether IDOT's assumption of willingness is appropriate and/or "how this assumption affects the measure of availability of DBE firms." His relative capacity analysis was similarly speculative, arguing that the

---

[2] The NERA studies do not account for firm capacity. According to Dr. Wainwright, that is because excluding firms based on capacity would preclude the government from instituting a remedy, since discrimination itself has prevented minority- and women-owned firms from achieving the capacity required to compete for contracts. See *Rothe Development Corp. v. Dep't of Defense*, 545 F.3d 1023, 1045 (Fed. Cir. 2008) (recognizing that "a minority-owned firm's capacity and qualifications may themselves be affected by discrimination"). The Mason Tillman study found no effective way to account for capacity, but it performed a regression analysis to measure relative capacity and limited its disparity analysis to contracts under $500,000 to take capacity into account to the extent possible.

assumption that firms have the same ability to provide services up to $500,000 "may not be true in practice," and that *if* the estimates of capacity are too low, "the resulting disparity index overstates the degree of disparity that exists." And so on: he argued that the existence of the DBE program "may" cause an upward bias in availability, that any observations of the public sector in general "may" be affected by the DBE program's existence, and that data become less relevant as time passes. Given the substantial utilization disparities shown in the defendants' reports, these speculative critiques do not raise a genuine issue of fact as to whether the defendants had a substantial basis in evidence to believe that action was needed to remedy discrimination.

Midwest Fence argues that requiring it to provide an independent statistical analysis places an "impossible burden" on it due to the time and expense that would be required. Recall, though, that the burden is initially on the government to justify its programs. Since the state defendants offered evidence to do so, the burden then shifted to Midwest Fence to show a genuine issue of material fact as to whether the state defendants had a substantial basis in evidence for adopting their DBE programs. Speculative criticism about potential problems will not carry that burden.

Even the capacity question, which is Dr. Guryan's strongest criticism (and which *Rothe* recognized as a serious problem in analyzing the Department of Defense's nationwide contract evaluation preferences, see 545 F.3d at 1044–45), does not undermine the substantial basis in evidence here. For one thing, Dr. Guryan and Midwest Fence have not explained how to account for relative capacity. In addition, even the

court in *Rothe* recognized that defects in capacity analyses are not fatal in and of themselves:

> To be clear, we do *not* hold that the defects in the availability and capacity analyses in these six disparity studies render the studies wholly unreliable for any purpose. Where the calculated disparity ratios are low enough, we do not foreclose the possibility that an inference of discrimination might still be permissible for *some* of the minority groups in *some* of the studied industries in *some* of the jurisdictions. And we recognize that a minority-owned firm's capacity and qualifications may themselves be affected by discrimination. But we hold that the defects we have noted detract dramatically from the probative value of these six studies, and, in conjunction with their limited geographic coverage, render the studies insufficient to form the statistical core of the "strong basis in evidence" required to uphold the statute.

545 F.3d at 1045 (emphases in original) (footnote omitted). Here, the defendants' studies do not suffer from the geographic problems in *Rothe*. They show striking utilization disparities in specific industries in the relevant areas. And they are consistent with the anecdotal and less formal evidence defendants have offered. Dr. Guryan's speculation that failure to account for relative capacity might have biased DBE availability upward does not undermine the "statistical core of the 'strong basis in evidence' required." *Id.*

In addition to the Guryan report, Midwest Fence repeats its argument that the disparity studies do not prove discrimination but are at best merely consistent with it. As noted above, a "state need not conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence for concluding that remedial action is necessary." *H.B. Rowe Co.*, 615 F.3d at 241; see also *Croson*, 488 U.S. at 501 (citing a Title VII case, *Hazelwood School District v. United States*, 433 U.S. 299, 307–08 (1977), for proposition that where "gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination"). Midwest Fence also attacks the anecdotal evidence defendants have offered. For the sake of argument, even if we assume that such anecdotal complaints by themselves could not supply the strong basis in evidence needed to institute a race- or gender-conscious remedy, those complaints here just bolster defendants' statistical analyses.

In an argument limited to the Tollway, Midwest Fence also attacks the Tollway's supporting data from before it instituted its DBE program, suggesting that those data are unreliable because: (1) trial testimony in *Northern Contracting*, 2005 WL 2230195, at *10, revealed that 1.5% to 1.7% of Tollway contract dollars went to DBEs in 2002 and 2003; and (2) the disparity study the Tollway eventually relied upon in enacting its own program found that overall, between 2000 and 2005, DBEs received 11.4% of contract dollars in construction. Alternatively, Midwest suggests, the Tollway must have had excellent DBE participation in 2000 and 2001 to come up with an 11.4% average in light of its dismal numbers from 2002 through 2005. (Recall that the Tollway awarded *no* contracts to DBEs in 2004 and only 0.1% of contracts to DBEs in 2005.) The Tollway responds that during *Northern Contracting*, it simply used the

best data available and that in any event both data sets show disparities, albeit to varying degrees.

The latter point is persuasive. We assume some of the Tollway's data are not exact. This is likely since the 2004–05 "experiment" was not formal, nor was it meant to be statistically rigorous. But the NERA numbers, which are likely the most reliable given the method, show significant disparities in the construction industry. The numbers from other sources are even more dismal. While every single number in the Tollway's arsenal of evidence may not be exact, the overall picture still shows beyond reasonable dispute a marketplace with systemic under-utilization of DBEs far below the "disparity index lower than 80 as an indication of discrimination," *H.B. Rowe Co.*, 615 F.3d at 244. Dr. Guryan's abstract criticisms do not undermine that core of evidence.

## 2. *Narrow Tailoring*

Finally, we come to the question of narrow tailoring: whether IDOT's and the Tollway's implementation of their DBE programs yielded "a close match between the evil against which the remedy is directed and the terms of the remedy," *Builders Ass'n of Greater Chicago*, 256 F.3d at 646. We return to the so-called *Paradise* factors: (a) "the necessity for the relief and the efficacy of alternative [race-neutral] remedies," (b) "the flexibility and duration of the relief, including the availability of waiver provisions," (c) "the relationship of the numerical goals to the relevant labor [here, construction] market," and (d) "the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171.[3]

---

[3] With regard to the issue of narrow tailoring, Midwest Fence argues that the district court improperly read our cases—particularly *Milwaukee*

The necessity of relief overlaps our analysis of IDOT's and the Tollway's strong basis in evidence for believing their programs were needed to remedy lingering effects of discrimination. As discussed above, Midwest Fence has not undermined the defendants' strong combination of statistical and other evidence to show that their programs are needed to remedy discrimination. Both IDOT and the Tollway use race- and gender-neutral alternatives. The undisputed facts show that those alternatives have not been sufficient to remedy discrimination. For IDOT, even the combination of race-neutral and race-conscious measures has not been enough to meet its overall goal. See also *Northern Contracting*, 473 F.3d at 724 ("[T]he record makes clear that IDOT uses nearly all of the methods described in [49 C.F.R.] § 26.51(b) to maximize the portion of the goal that will be achieved through race-neutral means.").

As for flexibility, both IDOT and the Tollway make front-end waivers available when a contractor has made good faith

---

*County Pavers Ass'n v. Fiedler*, 922 F.2d 419 (7th Cir. 1991), and *Northern Contracting*, 473 F.3d 715—as allowing the federal regulations to "preempt" the Constitution. The problem for plaintiffs challenging this sort of race-conscious program run by state or local governments subject to federal regulations is to identify the responsible level of government. As we explained above at pages 16–18, the federal regulations necessarily give states considerable flexibility so that their programs can be tailored narrowly to local history and markets. *Milwaukee County Pavers* and *Northern Contracting* should not be read to foreclose claims that a state or local government violates the Equal Protection Clause in the way that it implements those flexible federal regulations. In terms of those opinions, a state or local government would "exceed[] its federal authority," *Northern Contracting*, 473 F.3d at 721, citing *Milwaukee County Pavers*, 922 F.2d at 424–25, if it implemented federal law in a manner that violates the Equal Protection Clause.

efforts to comply with a DBE goal. Midwest argues that the low number of waivers granted, coupled with contractors' fears of having a waiver denied and thereby losing a contract, shows the system is a *de facto* quota system. We do not agree. IDOT and the Tollway have not granted large numbers of waivers, but there is also no evidence that they have *denied* large numbers of waivers. The evidence here does not show that defendants are responsible for failing to grant front-end waivers that contractors do not request.

In the absence of evidence that defendants fail to adhere to the general good faith effort guidelines and arbitrarily deny or discourage front-end waiver requests, Midwest Fence's contention that contractors fear losing contracts if they ask for a waiver does not make the system a quota system—even in the face of Illinois's supposedly waiver-averse political climate. See *Dunnet Bay*, 799 F.3d at 698–99 (rejecting argument that IDOT had implemented a no-waiver policy based on political pressures; evidence showed "unbroken record of granting waivers"). Midwest Fence's own evidence shows that in 2007, IDOT granted 57 of 63 front-end waiver requests, and in 2010, it granted 21 of 35 front-end waiver requests. This is not evidence of a quota system.

We know, as well, that the Tollway granted at least some front-end waivers between January 2006 and July 2012, involving 1.02% of contract dollars. Without evidence that far more waivers were requested, even this low total does not raise a genuine dispute of fact.

Midwest Fence also argues that we ought to look at the dollar value of waivers granted rather than the raw number of waivers granted. This argument is underdeveloped and in

any event does not support a different outcome here. The defendants grant more front-end waiver requests than they deny, regardless of the dollar amounts those requests encompass. If Midwest Fence intends to suggest that IDOT and the Tollway have an unwritten policy of granting only low-value waivers, it has presented no evidence to that effect.

Midwest Fence's final and best argument against narrow tailoring is its "mismatch" argument, discussed briefly above. Its broad condemnation of the IDOT and Tollway programs as failing to create a "light" and "diffuse" burden for third parties is not persuasive. In *Wygant*, the case from which it draws this standard, the Court's plurality wrote that "hiring goals impose a diffuse burden, often foreclosing only one of several opportunities," while "layoffs impose the entire burden of achieving racial equality on particular individuals," making that burden "too intrusive." 476 U.S. at 283. The DBE programs, which set DBE goals on only some contracts and allow those goals to be waived if necessary, may end up foreclosing "one of several opportunities" for a non-DBE specialty subcontractor like Midwest Fence. But there is no evidence that they "impose the entire burden" on that subcontractor by shutting it out of the market entirely, as a layoff of an employee would do. See *id.*

Nevertheless, Midwest Fence's point that subcontractors appear to bear a disproportionate share of the burden as compared to prime contractors is troubling. The evidence shows disparities in both the prime contracting and subcontracting markets. But under the federal regulations, individual contract goals are set *only* for contracts that have subcontracting possibilities. (This makes some sense. A "contract goal" on a contract without subcontracting possibilities would be the

equivalent of a set-aside with respect to that contract, which opens up a new set of problems.) Although some DBEs are able to bid on prime contracts, the necessarily small size of DBEs makes that difficult in most cases.

In the end, however, the record shows that the problem Midwest Fence raises is largely theoretical. Not all contracts have DBE goals, so subcontractors are on an even footing for those contracts without such goals. IDOT and the Tollway both use neutral measures, including some designed to make prime contracts more accessible to DBEs. There seems to be no dispute that DBE trucking and material suppliers count toward fulfillment of a contract's DBE goal—even though they are not used as line items in calculating the contract goal in the first place—which opens up even contracts with DBE goals to non-DBE subcontractors. Nor do we understand Midwest Fence's argument with respect to the 50% of the contract that Midwest Fence says *must* be performed by the prime contractor, per IDOT regulations. Illinois sets its contract goals with reference to subcontracting line items that can be performed by DBEs. That the goals are expressed as a percentage of the total contract does not seem to affect that fact.

If Midwest Fence had presented evidence rather than theory on this point, the result might be different. Evidence that subcontractors were being frozen out of the market or bearing the entire burden of the DBE program would likely require a trial to determine at a minimum whether IDOT and the Tollway were adhering to their responsibility to avoid overconcentration in subcontracting. See 49 C.F.R. § 26.33. Midwest Fence has shown how the Illinois program *could* yield that result but not that it actually does so.

In light of the IDOT and Tollway programs' mechanisms to prevent subcontractors from having to bear the entire burden of the DBE programs—the use of DBE materials and trucking suppliers in satisfying goals, efforts to draw DBEs into prime contracting, and so on—Midwest Fence has not shown a genuine dispute of fact on this point. The theoretical possibility of a "mismatch" could be a problem, but we have no evidence that it actually is. See *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (inferences supported only by speculation or conjecture will not defeat a summary judgment motion).

We conclude that the IDOT and Tollway DBE programs are narrowly tailored to serve the compelling state interest in remedying discrimination in public contracting. They include race- and gender-neutral alternatives, set goals with reference to actual market conditions, and allow for front-end waivers. So far as the record before us shows, they do not unduly burden third parties in service of remedying discrimination. Midwest Fence has failed to present a genuine dispute of fact on this point.

The judgment of the district court is AFFIRMED.